# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
### AT LOUISVILLE

_____

| | |
|---|---|
| **MARIA BENITEZ and LUCRETIA HOCKER,** | No. 3:08CV-211-H |
| **On behalf of themselves and all others similarly situated;** | |
| | |
| **and** | |
| | |
| **MICHAEL J. ROSE, member plaintiff from 3:08CV-236-H;** | |
| | |
| **and** | |
| | |
| **CONNIE RIGGS, member plaintiff From 3:08CV-304-H** | |
| | |
| **v.** | |
| | |
| **HUMANA, INC. from member defendant** | |
| **3:08CV-211, 236, 304-H; and** | |
| **MICHAEL B. McCALLISTER, from member defendant** | |
| **3:08CV-211, 236, 304-H; and** | |
| **JAMES H. BLOEM, from member defendant** | |
| **3:08CV-211, 236, 304-H; and** | |
| **DAVID A. JONES, JR., from member defendant** | |
| **3:08CV-236-H; and** | |
| **FRANK A. D'AMELIO, from member defendant** | |
| **3:08CV-236-H; and** | |
| **W. ROY DUNBAR, from member defendant** | |
| **3:08CV-236-H; and** | |
| **KURT J. HILZINGER, from member defendant** | |
| **3:08CV-236-H; and** | |
| **WILLIAM J. McDONALD, from member defendant** | |
| **3:08CV-236-H; and** | |
| **JAMES J. O'BRIEN, from member defendant** | |
| **3:08CV-236-H; and** | |
| **ANN REYNOLDS, from member defendant** | |
| **3:08CV-236-H; and** | |
| **JOHN DOES, from member defendant** | |
| **3:08CV-211, 236 and 304-H** | |

_____

## AMENDED COMPLAINT FOR VIOLATIONS
## OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

## I.     INTRODUCTION

Plaintiffs Maria Benitez, Lucretia Hocker, Michael J. Rose and Connie Riggs ("Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following based upon the investigation by Plaintiffs' counsel, which included, *inter alia*, a review of public documents filed by Humana Inc. ("Humana" or the "Company") with the United States Securities and Exchange Commission ("SEC") and the United States Department of Labor ("DOL"), conference calls and announcements made by Defendants named herein, securities analysts' reports, wire and press releases published by the Company, other publicly available information, the Humana Retirement and Savings Plan ("Humana Savings Plan") and the Humana Puerto Rico 1165(e) Retirement Plan (the "Humana Puerto Rico Plan") (collectively referred to herein as the "Plan") and related materials.

## II.     NATURE OF THE ACTION

1.      This is a class action brought on behalf of the Plan, pursuant to §§ 502(a)(2) and (a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(2) and (a)(3), against the fiduciaries of the Plan for violations of ERISA.

2.      Plaintiffs' claims arise from the failure of defendants, who are fiduciaries of the Plan ("Defendants"), to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the period September 1, 2007 to the present (the "Class Period").

3.      Plaintiffs allege in Count I that Defendants, each having certain responsibilities regarding the management and investment of the Plan's assets, breached their fiduciary duties to the Plan and the Plan's participants by failing to prudently and loyally manage the Plan's investment in Company securities by (i) continuing to offer Humana common stock as a plan investment option when it was imprudent to do so; (ii) failing to provide complete and accurate

information to the Plan's participants regarding the Company's financial condition and the prudence of investing in Company stock; and (iii) maintaining the Plan's pre-existing investment in Humana stock when Company stock was no longer a prudent investment for the Plan.  These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

4.     In Count II, Plaintiffs allege that Defendants breached their duty of loyalty by failing to provide complete and accurate information with respect to the dissemination of Plan documents and/or Plan-related information to participants regarding the weakness of the Company's internal controls and other improper business practices that rendered Company stock an imprudent investment option for  the Plan.

5.     In Count III, Plaintiffs allege that Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and their participants' best interests in mind.

6.     In Count IV, Plaintiffs allege that the Director Defendants, defined below, breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of the Plan's assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering Humana stock as an investment option and investing the Plan's assets in Humana stock when it was no longer prudent to do so.

7.     As explained in more detail below, Defendants responsible for the Plan's investments imprudently permitted the Plan to purchase and hold Humana stock during the Class Period contemporaneous with and despite the Company's serious mismanagement, improper

business practices, and dire financial circumstances.  Defendants' breaches have caused the Plan and their participants to suffer millions of dollars in losses of retirement savings.

8.      This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

9.      ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiffs to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiffs bring this action as a class action under FED. R. CIV. P. 23 on behalf of the Plan as well as all participants and beneficiaries of the Plan whose Plan accounts were invested in Humana stock during the Class Period.

10.      In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are made, by necessity, upon information and belief.  At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, seek leave to amend this complaint ("Complaint") to add additional facts that further support Plaintiffs' claims.

### III.      SUMMARY

11.      Humana provides various health and supplemental benefit plans for employer groups, government benefit programs and individuals.  These programs include Medicare, a federal program that provides hospital and medical insurance benefits to persons of age sixty-five (65) and over, and Medicaid, a federal program that facilitates the delivery of health care

services primarily to low-income residents.  Medicare and Medicaid are administered by the Centers for Medicare & Medicaid Services (the "CMS"), a federal agency.

12.     Medicare is broken down into four categories, labeled Parts A through D: (i) Medicare Part A covers hospital insurance; (ii) Medicare Part B covers medically necessary services, such as outpatient care; (iii) Medicare Part C is the combination of Parts A and B. Medicare Part C, however, is provided through private insurance companies, approved by Medicare; and (iv) Medicare Part D is a stand-alone federal program designed to subsidize the costs of prescription drugs for Medicare beneficiaries in the United States.  Under Medicare Part D, prescription drugs are covered up to a certain point.  Coverage then stops until costs for the prescription drugs reach a higher level.  This portion not covered by insurance is known as the "coverage gap."  Certain health insurance companies also offer insurance policies that cover the coverage gap.

13.     Starting in 2006, Humana began offering stand-alone prescription drug plans ("PDPs") under Medicare Part D.  PDPs offer basic coverage with benefits mandated by Congress, as well as provide enhanced coverage with varying degrees of out-of-pocket costs for premiums, deductibles and co-insurance to Medicare-eligible individuals.   One of the requirements for offering PDPs, as sets forth by the CMS, is that consumers are responsible for no more than 33% of the costs before the coverage gap.  The Company attempts to meet the 33% costs exactly.  Since the Company sets its premiums for the year in advance, its actuarial assumptions are vitally important in attempting to hit 33% of costs paid for by its customers. Further, the Company submits these actuarial assumptions to the CMS to show that its customers are only paying 33%.  The Company enters into contracts with the CMS for one-year terms on December 31st of each year.

14.     At the end of September 2007, the Company announced its guidance for the 2008 fiscal year, taking into account its PDPs.  The Company projected that its earnings per share ("EPS") would be between $5.30 and $5.50.  This announcement started a three-month rally in the Company's stock.

15.     On January 9, 2008, the Company reaffirmed its 2008 guidance.  This good news pushed the Company's stock price to all-time highs of almost $87 per share.  On February 4, 2008, the Company announced that it expected its first quarter EPS to be between .80 and .85 (cents).

16.     On March 11, 2008, one of the Company's chief rivals, WellPoint Inc., announced that it would cut its earnings guidance for 2008, citing higher medical costs and a weak economy.  The next day, the Company announced to a nervous market that it drastically misestimated its own earnings for the first quarter and for the fiscal year 2008.  The Company cut its expected EPS for the first quarter to .44 to .46 cents, almost half what was previously announced, and its full year's earnings to $4.00 to $4.25 per share, down $1.30.

17.     The reasons that caused the Company to drastically reduce its earning guidance were not fully revealed until Humana held a conference call on March 12, 2008 with analysts.  During that call, certain Defendants explained that they overestimated the use of prescription drugs that carry high co-payments, known as "tier III" drugs, by the Company's customers.  According to the Company's internal estimates, the tier III drugs would rise from their historical utilization rate of 6% to 15%.  This is important because if consumers continued to use tier III drugs with the high co-payments, the Company's customers' personal costs would exceed the 33% limit set forth by the CMS, and Humana's prescription drug plan would not be approved by

the CMS.  According to its internal estimates, the Company thus had to lower the co-payments for its customers to fall at or below the 33% cut-off mandated by the CMS.

18.     The internal estimates of tier III drug usage, however, were wrong, and Defendants either knew or should have known that they were incorrect.  As Defendant James E. Murray ("Murray"), the Company's Chief Operations Officer, admitted, Defendants should have known that consumers would switch to lower-costing prescription drugs.

19.     Before realizing the estimation error, however, the co-payments for the Company's PDP were set.  Meanwhile, the tier III drugs stayed at their normal utilization rate of 6%.  Therefore, customers switched to the lower-costing drugs with lower co-payments.  This meant that the Company's PDP customers were not paying the target rate of 33% of the costs of the prescription drugs.  Instead, consumers only paid 26% of the drug costs.  In the words of Defendant James H. Bloem ("Bloem"), the Company's Chief Financial Officer ("CFO"), this miscalculation "is a professional embarrassment."

20.     The Company's PDPs constitute a major segment of Humana's business. Defendants have a duty to ensure that the PDPs are run effectively and that the estimates the Company bases its pricing on are accurate.  The mistake in estimates cost the Company hundreds of millions of dollars.  The difference between paying 26% of costs and paying 33% of costs equals $160 million in prescription drug costs that the Company now has to cover.  Further, new high-cost customers were lured to the Company's PDP plan due to its low co-payment.  This addition of new customers further depressed the Company's earnings.  These new, high-cost customers cost the Company an additional $50 per month per member compared to returning members, thus dragging down the Company's earnings by another approximate $80 million. Defendants either knew or should have known they could not accurately gauge the Company's

PDP customer costs and/or they were reckless in agreeing to charge co-payments based on drastically incorrect estimates.

21.     When the truths about the Company's earnings were revealed, its market capitalization took an immediate and severe hit.  On March 12, 2008, the Company's market capitalization dropped 14%.  Overall, the Company lost over 50% of its value as its market capitalization fell from $14.7 billion to $6.8 billion, a $7.9 billion loss.  Significantly, the Company set forth its first quarter 2008 earnings guidance just a month before making this announcement, thus artificially inflating the Company's stock price.

22.     While Defendants' monumental mistake severely damaged the Company, certain Defendants capitalized on that artificial inflation by selling over *$26 million worth of their personally owned shares.*

### IV.     JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(l).

24.     ERISA provides for nation-wide service of process.  ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All Defendants are either residents of the United States or subject to service in the United States.  Therefore, the Court has personal jurisdiction over them.  The Court also has personal jurisdiction over Defendants pursuant to FED. R. CIV. P. 4(k)(1)(A) because they are all subject to the jurisdiction of a court of general jurisdiction in the State of Kentucky.

25.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, and Humana has its principal place of business in this District.

## V.    PARTIES

### A.    Plaintiffs

26.    Plaintiff Maria Benitez was an employee of Humana during the Class Period and continues to be a Plan participant, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).  Humana stock was purchased or maintained on her behalf by means of the Humana common stock fund investment option in the Plan ("Humana Stock Fund").

27.    Plaintiff Lucretia Hocker was an employee of Humana during the Class Period and continues to be a Plan participant, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).  Humana stock was purchased or maintained on her behalf by means of the Humana Stock Fund.

28.    Plaintiff Michael J. Rose was an employee of Humana during the Class Period and continues to be a Plan participant, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).  Humana stock was purchased or maintained on his behalf by means of the Humana Stock Fund.

29.    Plaintiff Connie Riggs was an employee of Humana during the Class Period and continues to be a Plan participant, within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).  Humana stock was purchased or maintained on her behalf by means of the Humana Stock Fund

### B.    The Company Defendant

30.    ***Defendant Humana*** is a Delaware corporation, with its principal executive offices located at 500 West Main Street, Louisville, KY 40202.  Humana provides various health and supplemental benefit plans for employer groups, government benefit programs, and individuals in the United States.  During the Class Period, Humana common stock traded on the New York Stock Exchange ("NYSE").

31.     Humana is the Plan's sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), and as such, exercises discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.  The Company, at all times, acted through its officers, directors and employees, including, but not limited to, members of the (i) Board of Directors' Organization and Compensation Committee (the "Compensation Committee"); (ii) Board of Directors' Investment Committee (the "Investment Committee"); and (iii) the Retirement and Savings Plan Committee (the "Plan Committee"), who were appointed by Humana to perform plan-related fiduciary functions, and did so in the course and scope of their services for the Company.

32.     According to a document entitled "Humana Retirement and Savings Plan Changes" dated January 2004 ("2004 Plan Changes"), Humana is also the Plan administrator. According to the Plan, as administrator, Humana is the named fiduciary for the following purposes:

> (1)     For the control and management of the operation and administration of the Plan, including, without limitation, the performance of the duties and obligations required of it in this Plan and the Trust, except for those duties herein specifically allocated to the committee, the Board of Directors and the Trustee.
>
> (2)     For the furnishing to the other fiduciaries hereunder such information related to the administration of the Plan as they may require.

*See* Plan, Article 19.2(a).

33.     Humana had, upon information and belief, at all applicable times, effective control over the activities of its officers and employees, including their plan-related activities. Through its Board of Directors (the "Board"), or otherwise, the Company had the authority and discretion to hire and terminate said officers and employees.  The Company also had the

authority and discretion to appoint, monitor and remove officers and employees from their individual fiduciary roles with respect to the Plan.

34.     According to the Plan documents, the Company may also appoint an investment manager to be the Humana Unitized Stock Fund Fiduciary, endowed with the exclusive fiduciary authority and responsibility to exercise the following powers:

- to restrict the investment of new participant or employer contributions in Humana Unitized Stock Fund;
- to restrict the transfer of participant account balances into the Humana Unitized Stock Fund;
- **_to sell or otherwise dispose of all the Common Stock held in the Humana Unitized Stock Fund_**;
- to restrict the transfer of participant account balances out of the Humana Unitized Stock Fund during any period in which the Humana Unitized Stock Fund Fiduciary is directing the sale or other disposition of Common Stock in the Humana Unitized Stock Fund;
- to designate an alternative investment fund available under the Plan for the temporary investment of any proceeds from any sale or other disposition of Common Stock pending participant directions to the trustee of the Plan with respect to the investment of such proceeds;
- to vote the Common Stock in the Humana Unitized Stock Fund in accordance with the terms of the Plan and applicable law; and
- to instruct the trustee of the Plan with respect to the forgoing matters.

*See* Plan, Section 5.11(g) (emphasis added).

35.     Additionally, by failing to properly discharge their fiduciary duties under ERISA, the officer, director, and employee fiduciaries breached duties they owed to the Plan's participants and their beneficiaries.  Accordingly, the actions of the Plan's officers, directors, and other employee fiduciaries are imputed to Humana under the doctrine of *respondeat superior*, and the Company is liable for these actions.

C.      **Director and Officer Defendants**

1.      **Director Defendants**

36.     The Director Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

37.     Specifically, the members of the Board "shall be named  fiduciary for the following purposes:  (1) [f]or the removal of the Trustee and the appointment of a successor Trustee, as provided in the Trust. (2) [f]or the termination of the Plan […] (4) [f]or the designation of a Related Employer to become an Employer . . . ."  *See* Plan, Article 19.2(b).

38.     ***Defendant Michael B. McCallister*** ("McCallister") has served as president, chief executive officer and director of Humana since February 2000.  Defendant McCallister signed Humana's relevant SEC filings during the Class Period, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the statements alleged herein to be inaccurate, and communicated both directly and indirectly with Plan's participants.  Defendant McCallister was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.  Further, Defendant McCallister sold his personal shares of Humana common stock (before the March 12, 2008 announcement) for proceeds of $15,797,321.35.

39.     ***Defendant David A. Jones, Jr.*** ("Jones") has served as chairman of the Board since April 2005, having served as vice chairman of the Board since September 1996.  Defendant Jones was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and

administration of the Plan and/or management and disposition of the Plan's assets.  Specifically, as chairman of the Board, Defendant Jones was "the named fiduciary for the purposes of appointing or removing the members of the [Plan] Committee . . . ."  *See* Plan, Article 19.2(c).  Further, Defendant Jones sold his personal shares of Humana common stock (before the March 12, 2008 announcement) for proceeds of $1,470,763.40.

40.    ***Defendant Frank A. D'Amelio*** ("D'Amelio") has served as a director of Humana since September 2003.  Defendant D'Amelio was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

41.    ***Defendant W. Roy Dunbar*** ("Dunbar") has served as a director of Humana since April 2005.  Defendant Dunbar was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

42.    ***Defendant Kurt J. Hilzinger*** ("Hilzinger") has served as a director of Humana since July 2003.  Defendant Hilzinger was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

43.    ***Defendant William J. McDonald*** ("McDonald") has served as a director of Humana since October 2007.  Defendant McDonald was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary

authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

44.     **Defendant James J. O'Brien** ("O'Brien") has served as a director of Humana since April 2006.  Defendant O'Brien was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

45.     **Defendant W. Ann Reynolds** ("Reynolds") has served as a director of Humana since January 1991.  Defendant Reynolds was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that she exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

46.     Defendants McCallister, Jones, D'Amelio, Dunbar, Hilzinger, McDonald, O'Brien and Reynolds shall be referred to collectively herein as the "Director Defendants".

47.     The Board, upon information and belief, has primary fiduciary oversight of the Plan.  The Director Defendants are fiduciaries of the Plan within the meaning of ERISA in that they exercise discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets; and/or (iii) appointing, monitoring, and removing the Plan's fiduciaries.

48.     Because of the Director Defendants' positions on the Board, they knew the adverse non-public information about the business of the Company, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board

meetings and committees thereof and via reports and other information provided to them in connection therewith.

49.     During the Class Period, the Director Defendants participated in the issuance of inaccurate statements, including the preparation of the inaccurate press releases and SEC filings.

### 2.     Officer Defendants

50.     **Defendant James H. Bloem** ("Bloem") has served as senior vice president, chief financial officer ("CFO") and treasurer of Humana since February 2001.  Defendant Bloem signed Humana's relevant SEC filings during the Class Period, including the Company's Forms 11-K, participated in the day-to-day management and overall direction of the Company, participated in the preparation of the public statements alleged herein to be inaccurate, and communicated both directly and indirectly with the Plan's participants.  Defendant Bloem was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition.  Defendant Bloem was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.  Further, Defendant Bloem sold his personal shares of Humana common stock (before the March 12, 2008 announcement) for proceeds of $1,223,672.52.

51.     **Defendant James E. Murray ("Murray")** served as Chief Operating Officer ("COO"), having held this position since February 2006.  Prior to that,  Defendant Murray held the position of Chief Operating Officer -- Market and Business Segment Operations from September 2002 to February 2006, Chief Operating Officer -- Service Operations from February 2001 to September 2002, and Chief Operating Officer -- Health Plan Division and Interim Chief

Financial Officer from February 2000 to February 2001.  Defendant Murray joined the Company in October 1989.  Defendant Murray was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition.  Defendant Murray was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.  Further, Defendant Murray sold his personal shares of Humana common stock (before the March 12, 2008 announcement) for proceeds of $2,269,367.27.

D.     **The Compensation Committee Defendants**

52.     *Defendant Hilzinger*, in addition to being a member of the Board, served as the chairman of the Compensation Committee, at all relevant times.  As such, Defendant Hilzinger was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

53.     *Defendants Dunbar* and *McDonald*, in addition to being members of the Board, served as members of the Compensation Committee.  As such, Defendants Dunbar and McDonald were a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

54.     *Defendant Compensation Committee*.  In addition to the Board, the Compensation Committee, upon information and belief, is also a fiduciary of the Plan. According to the Compensation Committee's charter, available on Humana's corporate website, the Compensation Committee is charged with, *inter alia*, "[a]dminister[ing] the Company's equity compensation programs, including stock option(s) and restricted stock."

55.     The charter of the Compensation Committee provides:  "[T]he Committee reviews the Company's management development planning status and policies, including succession planning, *monitors compensation actions* by management below the executive level . . . .  Consider from time to time and review and approve, or recommend to the Board for approval when it deems such approval appropriate, additional executive compensation and employee benefit programs, including . . . retirement and savings plans . . . ."

56.     The Compensation Committee and its members therein are fiduciaries of the Plan within the meaning of ERISA in that they exercise discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.  Further, each member of the Compensation Committee, by virtue of their committee position, was a member of the Board and therefore also had fiduciary responsibility to the Plan and their participants.

E.     **Investment Committee Defendants**

57.     ***Defendant Dunbar***, in addition to being a member of the Board, served as the chairman of the Investment Committee, at all relevant times.  As such, Defendant Dunbar was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that he exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

58.     ***Defendants D'Amelio and O'Brien***, in addition to being members of the Board, served as members of the Investment Committee.  As such, Defendants Dunbar and O'Brien were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

59.     ***Defendant Investment Committee***.  In addition to the Board collectively, the Plan Committee, upon information and belief, is also a fiduciary of the Plan.  According to the Investment Committee's charter, available on Humana's corporate website, the Investment Committee is responsible for, *inter alia*: "(1) [e]stablishing investment options, policies, and allocations for the investment portfolios of the Company and its subsidiaries as well as investment options available under the Company's employee benefit Plan; [and] (2) [r]eviewing investment performance of the . . . employee benefit plans."

60.     The Investment Committee's charter further provides that "[t]he primary function of the Investment Committee is to assist the Board of Directors in establishing investment objectives and policies for the Company's investment portfolios and employee benefit plans." The charter also directs that "[t]he chairman of the Investment Committee . . . shall report on behalf of the Committee to the full Board at each regularly scheduled meeting with respect to any action taken by the Committee if any meetings of the Committee have been held (or action otherwise taken) since the date of the previous Board meeting."

61.     The Investment Committee Defendants were fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority and discretionary control with respect to the Plan's management, administration, investments, and assets.

**F.**     **The Plan Committee Defendants**

62.     At all times relevant hereto, Defendant Bonnie C. Hathcock ("Hathcock") served as Humana's senior vice president and chief human resources officer.  Upon information and belief, Defendant Hathcock was charged with day-to-day administration and management of the Plan and served as member of the Plan Committee.

63.     At all times relevant hereto, Defendant Deborah M. Triplett ("Triplett") served as Humana's director of Associate Benefit Programs and Policy.  Upon information and belief,

Defendant Triplett was charged with day-to-day administration and management of the Plan and served as member of the Plan Committee.

64.     **Defendant Plan Committee.**   In addition to the Board collectively, the Plan Committee, upon information and belief, is also a fiduciary of the Plan.

65.     ***Defendants John Does 3-10 (the "Plan Committee Defendants")***, at all relevant times, served as members of the Plan Committee. At all relevant times, the Plan Committee Defendants were charged with certain administrative functions associated with the Plan. Defendant Jones is responsible for appointing the members of the Plan Committee.  According to the 2004 Plan Changes, the Plan Committee members in turn were responsible for making all policy decisions arising under the Plan and reviewing and ruling on any claims that may be appealed after having previously been denied by the Plan administrator.

66.

## VI.     THE PLAN

67.     The Plan is an "employee pension benefit plan," as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).   Specifically, the Plan is "defined contribution plan[s]" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).  The Plan is a legal entity that can sue and be sued.   ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).   However, in a breach of fiduciary duty action such as this, the Plan is neither plaintiff nor defendant.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan, its participants and beneficiaries.

68.     The Plan covers eligible employees of Humana and its subsidiaries.

69.     According to the an amendment that went into effect on December 31, 2007, the Plan provides that:

> **4.4 MATCHING CONTRIBUTIONS.** Each Employer shall make a Matching Contribution for each Participant in its employment . . . who is eligible . . . . Such Matching Contribution shall be equal to (i) 100% of the amount of the Participant's regular Elective Deferral that does not exceed 1% of the Participant's Compensation, plus (ii) 50% of the Participant's regular Elective Deferral that exceeds 1% but does not exceed 6% of the Participant's Compensation . . . .

70.     All Company matching contributions are invested in the Humana Stock Fund. As of December 31, 2007, the Humana Savings Plan held 4,363,366 shares of Humana common stock valued at $328,605,093, or 29.74% of the Plan's total investments. As of December 31, 2007, the Humana Puerto Rico Plan held 55, 500 shares of Humana common stock valued at $4,179,705, or 29.35% of the Plan's total investments.

## VII.   DEFENDANTS' FIDUCIARY STATUS

### A.   The Nature of Fiduciary Status

71.     **Named Fiduciaries**. ERISA requires every plan to have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person or entity named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

72.     As previously stated, Humana is the Plan's sponsor and administrator.

73.     Upon information and belief, the Plan's documents describe Humana, the Board, chairman of the Board, the Compensation Committee, the Investment Committee and the Plan Committee as named fiduciaries of the Plan.

74.     Upon information and belief, instead of delegating all fiduciary responsibility for the Plan to external service providers, Humana chose to internalize at least some of these fiduciary functions. According to Humana's communications with Plan participants, "on a

regular basis, Humana senior leadership reviews the Plan to ensure its competitiveness and that it meets the long-term savings goals of our associates." *New Enhancements to the Retirement & Savings Plan*, dated November 28, 2007.

75.     Upon information and belief, the Plan and its assets are administered and managed by the Compensation Committee, Investment Committee and Plan Committee (collectively the "Plan Committees"), selected and monitored by the Board.   The Plan Committees exercised broad responsibility for management and administration of the Plan and, among their other duties, were responsible for oversight of the Plan's investment options, policies, and the performance of the Plan's investments, as well as the review of investment managers.

76.     In their capacity to select and monitor investment options for the Plan, the Plan Committees had the discretion and authority to suspend, eliminate, or reduce any plan investment, including investments in Humana stock.   Upon information and belief, the Plan Committees regularly exercised their authority to suspend, eliminate, reduce, or restructure the Plan's investments.   The Plan Committees also reported to the Board regarding these duties and the Plan's events pertaining to the same.

77.     Upon information and belief, the Plan Committees exercised responsibility for communicating with participants regarding the Plan, and providing participants with information and materials required by ERISA.   In this regard, on behalf of Humana and the Director Defendants, the Plan Committees disseminated the Plan's documents and materials.

78.     The Director Defendants are Plan fiduciaries to the extent they exercised their authority to select, monitor, retain, and remove the members of the Plan Committees and, accordingly, exercised authority and oversight over the Plan Committees, which reported to the

Board regarding the Plan Committees' fiduciary duties and responsibilities to the Plan and with respect to their actions pertaining to the same.

79.    Therefore, the participation in and knowledge of Humana's inappropriate and potentially unlawful practices by Defendants as alleged herein is imputed and attributed to Humana, the Plan Committees, and the Director Defendants.

80.    *De Facto* **Fiduciaries**.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  *Id*.

81.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its participants in the manner and to the extent set forth in the Plan's documents, under ERISA, and through their conduct.

82.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and its investments solely in the interest of the Plan participants and beneficiaries, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

83.     Plaintiffs do not allege that each defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by each of them, and the claims against each defendant are based on such specific discretion and authority.

84.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, Humana chose to assign the appointment and removal of fiduciaries to itself and the other Defendants named herein.  These persons and entities in turn selected Humana employees, officers and agents to perform most fiduciary functions.

85.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions.  ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3).   However, insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan's sponsor.

86.     Further, Humana acted as a fiduciary in connection with Plan communications. At all times during the Class Period, Humana's SEC filings were incorporated into and part of the Summary Plan Descriptions ("SPDs"), the Prospectus and/or the Form S-8 registration statements.  At all times during the Class Period, Humana's SEC filings were incorporated into and part of the SPD.

87.     The Company filed a Form S-8 Registration Statement with the SEC on May 31, 2006 ("Form S-8").  The Form S-8 still remains in effect.

88.     The Form S-8 expressly incorporated by reference all other documents filed by the Company with the SEC under the federal securities laws, including such documents filed subsequently to the Form S-8.  Accordingly, the Form S-8 explicitly states:

Item 3.  Incorporation of Certain Documents by Reference

The following documents filed by Humana Inc. (the "Company" or the "Registrant") with the Commission (File No. 1-5975) are incorporated herein by reference and made a part hereof:

(a)     The Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2005;

(b)      The Registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2006;

(c)     The Registrant's Current Reports on Form 8-K dated February 6, 2006; March 1, 2006; April 5, 2006; May 24, 2006; May 26, 2006 and May 31, 2006;

(d)     The Registrant's Current Report on Form 8-K dated May 1, 2006, but only to the extent that the information contained in that Current Report is deemed to be filed; and

(e)     The description of the Registrant's Common Stock, par value $0.16-2/3 per share (the "Common Stock"), contained in the Registrant's Registration Statement on Form 8-A, as such description may be amended or updated.

All documents filed by the Company pursuant to Sections 13, 14 and 15(d) of the Securities Exchange Act of 1934 ("Exchange Act"), subsequent to the date of this Registration Statement and prior to the filing of a post-effective amendment to this Registration Statement which indicates that all of the securities offered have been sold or which deregisters all of such shares then remaining unsold, shall be deemed to be incorporated by reference in this Registration Statement and to be a part hereof from the date of filing of such documents. Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Registration Statement to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Registration Statement.

89.     The SPD/Prospectus and Company filings referenced therein are the primary repository of information available to the Plan's participants for evaluation of Company stock as

a Plan investment.  Therefore, the act of incorporating these filings by reference transformed the statements contained therein into fiduciary disclosures and communications in their own right issued and transmitted to the Plan's participants, and upon which these participants relied in making investment decisions under the Plan concerning the propriety of including Humana stock as part of their savings plan investment portfolio.

90.     In addition, the 2004 Plan Changes specifically incorporates by reference the Company's Registration Statement on Form S-4 filed with the SEC on January 31, 1994.  The document states:

> All documents subsequently filed by the [C]ompany and the [P]lan pursuant to Section 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as amended, prior to the filing of a post-effective amendment which indicates that all of the securities offered hereby have been sold or which deregisters all of such securities then remaining unsold, shall be deemed to be incorporated by reference herein and to be a part hereof from the date of filing such documents.  Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes of this Summary to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement.  Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part hereof.

## VIII.  <u>SUBSTANTIVE ALLEGATIONS</u>

91.     Defendant Humana provides various health and supplemental benefit plans for employer groups, government benefit programs, and individuals in the United States.  The Company manages its business with two segments: Government and Commercial.  The Government segment consists of beneficiaries of government benefit programs, and includes three lines of business:  Medicare, Military, and Medicaid.  The Commercial segment consists of

members enrolled in the Company's medical and specialty products marketed to employer groups and individuals.

92.     As set forth more fully below, Defendants' inaccurate statements caused the Plan to lose millions of dollars in Plan assets.  The inaccurate statements referenced below failed to disclose that:  (a) the Company had significant material weaknesses in its internal controls such that the Company's financial reporting lacked a reasonable basis at all relevant times; (b) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the prescription drug costs of its newly acquired members; (c) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the correct pricing and discounts for members in its PDP plans; (d) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the mix shift of high and low cost members in its PDP plans; and (e) due to the significant material weaknesses in the Company's internal controls, the assumptions underlying the Company's first quarter and full year 2008 earnings guidance provided by Defendants in February of 2008 were flawed and inaccurate.

93.     Indeed, as can be seen from the chart below, as a result of Defendants' inaccurate statements (more fully described below), the Company's common stock traded at inflated prices throughout the Class Period, and then came crashing down when the truth was revealed, causing real and substantial losses to the Plan:



94.     The Company has participated in the Medicare program for private health plans for over twenty years.  Since recent significant changes were made to the Medicare program for health plans, the Company has expanded from a regional to a national presence.

95.     The Company contracts with CMS under the Medicare Advantage program to provide health insurance benefits including wellness programs to Medicare eligible persons under HMO, PPO, and PFFS plans in exchange for contractual payments received from CMS, usually a fixed payment per member per month.

96.     The Company refers to beneficiaries enrolled in these plans collectively as Medicare Advantage, or MA-PD, members.  With each of these products, the beneficiary receives benefits in excess of traditional Medicare, typically including reduced cost sharing, enhanced prescription drug benefits, care coordination, data mining techniques to help identify member needs, complex case management, tools to guide members in their health care decisions,

disease management programs, wellness and prevention programs, and a reduced monthly Part B premium.

97.     Since 2006, Medicare beneficiaries have had more health plan options, including a prescription drug benefit option and greater access to a PPO offering with the roll-out of Regional PPO plans.   Prior to 2006, PPO plans were offered on a local basis only.   Most Medicare Advantage plans must offer the prescription drug benefit under Part D as part of the basic plan, subject to cost sharing and other limitations.   Accordingly, all of the provisions of the Medicare Part D program described in connection with the Company's stand-alone prescription drug plans are applicable to the Company's Medicare Advantage plans.   Medicare Advantage plans may charge beneficiaries monthly premiums and other co-payments for Medicare-covered services or for certain extra benefits.

98.     CMS uses monthly rates per person for each county to determine the fixed monthly payments per member to pay to health benefit plans. These rates are adjusted under CMS's risk adjustment model which uses health status indicators, or risk scores. The risk adjustment model, which CMS implemented pursuant to the Balanced Budget Act of 1997 ("BBA") and the Benefits and Improvement Protection Act of 2000 ("BIPA"), uses principal hospital inpatient diagnoses as well as diagnosis data from ambulatory treatment settings (hospital outpatient department and physician visits).

99.     CMS transitioned to this risk-based reimbursement model while the old reimbursement model based on demographic data including gender, age, and disability status was phased out.   In 2006, the portion of risk adjusted payment was increased to 75% from 50% in 2005.   The phase-in of risk adjusted payment increased to 100% in 2007.   Under the risk

adjustment methodology, all health benefit organizations must capture, collect, and submit the necessary diagnosis code information to CMS within prescribed deadlines.

100.    According to the Company's Form 10-K for the fiscal year ended December 31, 2007, the Company "had approximately 11.5 million members in [its] medical benefit plans, as well as approximately 6.8 million members in [its] specialty products.  During 2007, 71% of [its] premiums and administrative services fees were derived from contracts with the federal government, including 17% related to [its] contracts in Florida with the Centers for Medicare and Medicaid Services ("CMS") and 12% related to [its] military services contracts.  Under the Company's CMS contracts in Florida, the Company provides health insurance coverage to approximately 507,700 members as of December 31, 2007."

**A.    Medicare Stand-Alone Prescription Drug Products**

101.    On January 1, 2006, the Company began offering PDPs under Medicare Part D. Generally, Medicare-eligible individuals enroll in one of the Company's three plan choices between November 15 and December 31 for coverage that begins January 1.  The enrollment period was extended to May 31 during 2006 because it was the first year of the program.  The Company's stand-alone PDP offerings consist of plans offering basic coverage, as well as plans providing enhanced coverage with varying degrees of out-of-pocket costs for premiums, deductibles and co-insurance.

102.    The Company offers three Medicare PDPs:  (i) Standard Plan; (ii) Enhanced Plan; and (iii) Complete Plan.

**1.    Standard Plan**

103.    The Standard Plan is an option for members who do not use a lot of prescription drugs.  The Standard Plan provides the minimum prescription drug coverage required by CMS.

104.    The Standard Plan is a basic plan equal to the federal government's minimum requirements:

- Members have a $265 deductible;

- After the member meets the deductible, Humana pays 75 percent, and the member pays 25 percent, until total drug costs reach $2,400;

- If a member's drug costs go above $2,400, the member enters the "coverage gap" – the member pays 100 percent of drug costs until he or she spends a total out-of-pocket of $3,850 on covered drugs; and

- After that, Humana pays 95 percent, and the member pays 5 percent, for the remainder of the plan year.

**2.    The Enhanced Plan**

105.    The Enhanced Plan offers broad coverage to help members manage their drug costs:

- The plan has no annual deductible;

- Members have predictable, set co-payments for covered drugs until total drug costs paid by both the member and the plan reach $2,400;

- If a member's drug costs go above $2,400, the member enters the "coverage gap" – the member pays 100 percent of drug costs until he or she spends a total out-of-pocket of $3,850 on covered drugs; and

- After that, Humana pays 95 percent, and the member pays 5 percent, for the remainder of the plan year.

**3.    The Complete Plan**

106.    The Complete Plan provides extensive coverage throughout the year:

- The Complete Plan has no annual deductible;

- Members have low co-payments for covered drugs until drug costs paid by both the member and the plan reach $2,400;

- After their prescription costs reach $2,400, members enter the "coverage gap" – members continue to pay their predetermined co-payment for preferred generics and 100 percent for all other drugs until their total out-of-pocket spending reaches $3,850;

- After total out-of-pocket spending reaches $3,850, Humana pays 95 percent for covered drugs and members pay 5 percent.

107.    The Company's PDP contracts with CMS are renewed generally for a one-year term each December 31 unless CMS notifies Humana of its decision not to renew by August 1 of the year in which the contract would end, or Humana notifies CMS of its decision not to renew by the first Monday in June of the year in which the contract would end.

108.    The Company's revenues from CMS and the beneficiary are determined from its bids submitted annually to CMS.  Humana's bid amount generally represents the payment that the Company receives from CMS.  However, this payment is subject to adjustments and subsidies in order for the Company and CMS to share the risk associated with financing the ultimate cost of the health benefit.  Further, the amount of the payment the Company receives from CMS is subject to the risk adjustment payment process previously described in order to take into account beneficiaries' health status risk factors.

## IX.    INADEQUATE INTERNAL CONTROLS

109.    During the Class Period, Humana's internal controls relating to pharmacy claims processing and claims data were severely deficient, which compromised the Company's ability to generate reliable financial forecasts and actuarial estimates.  Upon information and belief, the Pharmacy Business Unit at Humana, responsible for negotiating prescription prices with

pharmacy chains, utilized outdated claims-processing software programs that failed to properly organize and track claims data, thus resulting in significant pricing errors.

110.    Because Humana used a third party, Argus Health Systems ("Argus"), to serve as the "middle man" between the Company and the pharmacies that filled prescriptions for the Company's PDP enrollees, it was crucial that Argus received precise data from Humana to ensure proper pricing for the prescriptions.  The failure to organize and coordinate information concerning prescription pricing, input by Humana's employees at the Pharmacy Business Unit, caused by the outdated claims processing software, resulted in flawed information being transmitted to Argus, which in turn led to inconsistent prescription pricing (even within the same pharmacy chain's locations within a state).

## X.    INACCURATE STATEMENTS TO THE PLAN'S PARTICIPANTS

111.    During the Class Period, in order to maintain the Company's image as a steady earnings performer and as having strong financial growth, Humana persistently overstated its earnings estimates and failed to inform the Plan's participants that the Company had mispriced its stand-alone PDPs and that the Company's PDP-related costs had increased significantly.  The eventual disclosure of Humana's true state of business affairs caused a precipitous decline in the price of the Company stock and the consequent detrimental impact to the value of Plan's participants' retirement savings.

112.    On September 30, 2007, Humana issued its earnings release, made part of its Form 8-K filing with the SEC (the "September 30, 2007 Form 8-K"), for the fiscal third-quarter 2007, and guidance for full fiscal years 2007 and 2008, including expected earnings-per-share ("EPS").  The Company informed the investors in its September 30, 2007 Form 8-K that:

> . . . The company's 3Q07 performance was also $0.05 per share better than expected due to ongoing improvements in the company's Commercial operations and stand-alone Medicare

Prescription Drug Plans (PDPs) that are expected to positively impact fourth quarter 2007 and full-year 2008 results.

. . . The company also projects EPS for the year ending December 31, 2008 (FY08E) to be in the range of $5.30 to $5.50, an increase of 10 to 16 percent over FY07E EPS, or 16 to 22 percent (a)(c) versus the non-GAAP EPS for FY07E.

"Strong performance in both our business segments fueled a successful third quarter," said Michael B. McCallister, Humana's president and chief executive officer. "Most importantly, the quarter positioned us well to extend our industry-leading growth in both revenues and earnings through 2008 and beyond."

113.    On October 29, 2007, the Company issued a press release announcing its third quarter 2007 financial results, which reiterated that Humana's projected EPS for the 2008 fiscal year was $5.30 to $5.50 and that the PDPs are expected to "positively impact fourth quarter 2007 and full-year 2008." In particular, the press release stated in relevant part:

- EPS for third quarter 2007 of $1.78 including $0.25 per share from items not expected to recur in future periods.

- 2007 EPS guidance revised to $4.75 to $4.80 including $0.25 per share described above.

- ***2008 EPS projected to be $5.30 to $5.50.***

Humana Inc. today reported financial results for the quarter ended September 30, 2007 (3Q07) including diluted earnings per common share (EPS) of $1.78, significantly above the company's previous guidance for 3Q07 EPS of $1.45 to $1.50. The company earned $0.95 per share for the quarter ended September 30, 2006 (3Q06). The company's 3Q07 EPS included earnings of $0.25 per share(a) that are not anticipated to recur in future periods. ***The company's 3Q07 performance was also $0.05 per share better than expected due to ongoing improvements in the company's Commercial operations and stand-alone Medicare Prescription Drug Plans (PDPs) that are expected to positively impact fourth quarter 2007 and full year 2008 results.***

The company now estimates EPS for the year ending December 31, 2007 (FY07E) will be in the range of $4.75 to $4.80 versus $2.90 for the year ended December 31, 2006 (FY06). The company also projects its EPS for the year ending December 31,

- 33 -

2008 (FY08E) to be in the range of $5.30 to $5.50, an increase of 10 to 16 percent over FY07E EPS, or 16 to 22 percent (a)(c) versus the non-GAAP EPS for FY07E.

"Strong performance in both our business segments fueled a successful third quarter," said Michael B. McCallister, Humana's president and chief executive officer.   "Most importantly, the quarter positioned us well to extend our industry-leading growth in both revenues and earnings through 2008 and beyond."

For the nine months ended September 30, 2007 (YTD07) the company reported $3.48 in EPS compared to $1.98 for the nine months ended September 30, 2006 (YTD06).  Results for YTD07 on a non-GAAP basis were $3.23 per diluted share(a)(c).  Results for YTD06 included approximately $0.19 per share of venture capital gains that did not recur in YTD07.  The year-over-year increase in YTD07 financial results was primarily due to better operating performance in both business segments.

114.    On January 9, 2008, the Company again re-affirmed its 2008 EPS guidance during a meeting of the Company's officers and investors and analysts.   According to the Company's Form 8-K filed with the SEC in connection with this meeting, Human's PDPs gross sales "are somewhat ahead of expectations."   The Company's Form 8-K stated in relevant part:

On January 9, 2008, officers of Humana Inc. (the "Company") will be meeting with investors and analysts at an industry conference. During the meetings, the Company intends to address its prospects and performance and will reaffirm the Company's earnings per share guidance for the full year 2008 of $5.30 to $5.50 as well as reiterating the Company's Medicare Advantage enrollment guidance for net membership additions in the range of 200,000 to 250,000 for the full year 2008.   Gross sales for Medicare Advantage to date for 2008 are on track with the Company's expectations, *while gross sales for stand-alone Prescription Drug Plans are somewhat ahead of expectations*.   The Company is continuing to receive January 2008 disenrollment data for all Medicare plans from the Centers for Medicare and Medicaid Services ("CMS"), consistent with historical disenrollment reporting patterns from CMS.

(Emphasis added).

115.    On February 4, 2008, the Company issued a press release announcing its financial results for the fourth quarter of 2007 and raising its earnings estimates for the full year 2008. The press release stated in relevant part:

> LOUISVILLE, Ky. -- (BUSINESS WIRE) -- Humana Inc. (NYSE: HUM) today reported financial results for the quarter ended December 31, 2007 (4Q07) including diluted earnings per common share (EPS) of $1.43, significantly above the company's previous guidance for 4Q07 EPS of $1.27 to $1.32 primarily due to a lower income tax rate for 2007 than previously anticipated and a gain from the sale of a venture capital investment during 4Q07. The company earned $0.92 per share for the quarter ended December 31, 2006 (4Q06).
>
> *      *      *
>
> ***The company has raised its EPS projection for the year ending December 31, 2008 (FY08E) to reflect a lower tax rate than previously anticipated, with EPS now expected to be in the range of $5.35 to $5.55, an increase of 9 to 13 percent over FY07 EPS, or 15 to 19 percent(a)(b) versus the non-GAAP EPS for FY07.***

(Emphasis added).

116.    In that same press release, Defendant McCallister stated in relevant part:

> "Our 2007 results show that Humana's unique value proposition resonates deeply with America's seniors[.]" […]    "Treating members as actively engaged health-care consumers instead of passive health-care users is what we do across all our lines of business, and accounts for Humana's across-the-board growth and success."

117.    Also on that date, the Company held a conference and reiterated the inaccurate statements regarding the Company's anticipated EPS.  Defendant McCallister stated in relevant part:

> Good morning, everyone, and thank you for joining us.   The financial results we are reporting this morning reflect another year of ***significant growth*** for Humana, further demonstrating our ability to anticipate and focus on the needs of our varied consumers and customers.   Through innovative plan design, clinical programs, financial forecasting and consumer education,

combined with **solid operational execution**, we continued to deliver a compelling value proposition to our growing membership base.   Our value proposition is built around the idea that consumers, if offered actionable information and guidance, are just as capable of making savvy, cost-effective decisions in health care as they do in their other purchasing choices.   In 2007, this approach produced a record-breaking year for membership, revenues and net income on top of a similarly record-breaking 2006.

The combination of leverage from our growing Medicare membership base, higher Commercial pre-tax margins and the continued solid performance of our Military Service business aligned to achieve record earnings per share again in 2007.   The $1.43 per share Humana earned in the fourth quarter of 2007 contributed to EPS for the full year of $4.91, approximately 69% higher than the $2.90 we earned in 2006.   Our fourth quarter came in above our previous expectations due to a lower-than-expected effective tax rate for 2007 and earnings from a venture capital gain. 2007 was an unusually strong year for earnings growth, as membership increases as operational execution amplified the full-year benefit of the doubling of our Medicare Advantage membership in 2006.   As Jim Bloem will explain, we anticipate $0.05 per share additional 2008 benefit due to the lower 2007 effective tax rate. ***Accordingly this morning we raised our 2008 earnings per share guidance to a range of $5.35 to $5.55, with continued membership growth and strong operational execution driving these results***.

*     *     *

***We believe the 2007 achievements just described position us well for 2008, both in terms of the existing environment and future trends.***   Let me touch briefly on what we consider the primary strategic considerations in the external environment and 2008 -- one, Medicare rates for 2009; two, Medicare sales environment; three, the Commercial sales environment; and, lastly, to the political environment.

First, preliminary payment rates for 2009 Medicare are expected in a few weeks, with the final rates due out on the first Monday in April.   While we estimate the Medicare rate book rates to the up in line with medical cost trend of four to 6%, a number of technical factors also come into play, which CMS details as part of its final rate release in April. ***Regardless, as we've done over the past 20***

- 36 -

> *years, we will adjust benefits to ensure the Medicare medical cost trend matches and net level of premium increase*.

(Emphasis added).

118.   During this conference call Defendant Bloem also stated in relevant part:

> As one might expect, the Part D benefit structure creates much of the variability in the Medicare benefits ratio between the quarters. However, just as 2007 was significantly different from 2006, 2008 is different from both of them.  Now, what's the same is that when we project our Medicare benefits ratio quarterly pattern for 2008, we continue to anticipate a pattern that is somewhat similar to 2007, with the ratio being the highest in the first quarter and the lowest in the fourth quarter, as dictated by the Part D benefit design.  ***However, the 2008 quarterly benefit ratio progression will be less pronounced versus 2007 as shown by the illustration on this slide.***
>
> ***The primary factor driving this less-pronounced pattern is the composition of our 2008 PDP membership, which has changed from last year.*** We have nearly 300,000 fewer low-income senior members effective January 1, with a higher percentage of non-low-income seniors in our Enhanced plan and a lower percentage of non-low-income senior members in the Complete plan.   The decline in the percentage of low-income members is particularly relevant in analyzing the quarterly patterns, because these seniors have a steeper declining slope to their quarterly benefits ratio progression versus the remaining Part D members, with the first quarter ratio much higher on low incomes than the overall average and the fourth quarter much lower. ***Consequently, our lower membership in the low-income block is anticipated to lower the quarterly benefits ratio pattern in the first half of the year and raise it slightly in the back half of the year compared to 2007***.
>
> Another factor in the quarterly benefits ratio pattern is the widening of the Medicare Part D risk share corridors. All things being equal, which of course they never are, this change would likely reduce the size of the Part D risk share balance at the end of each quarter. However, the magnitude of this factor on each quarter's benefit ratio is not all that significant.
>
> *          *          *
>
> ***Here's the twofold take away, the composition of our PDP membership will have a significant impact on the quarterly pattern of our Medicare benefits ratio without necessarily***

*impacting the full year ratio. Secondly, the 2008 quarterly Medicare benefits ratio pattern is expected to drive our quarterly earnings per share for this year*.

\*     \*     \*

Finally, also as expected, prescription drug trends were in the mid to high single digits. Based on our ongoing deep-dive analysis of benefit expense trend factors, *we do not foresee any significant changes to the components of our cost trends as we move into 2008, as is stated in this morning's press release. So accordingly, we remain confident of our ability to meet our 2008 Commercial pretax earnings target of $280 million to $300 million and we look forward to sharing our progress with you each quarter.*

(Emphasis added).

119.    Responding to a question from an analyst, Defendant Bloem stated:

**Christine Arnold – Morgan Stanley**

A couple questions, first could you talk about how your pricing, are you pricing assuming a deceleration in medical trend?  Could you talk about how you are thinking about that, because I know there's a mix adjustment? Calculating that the PDP loss ratio probably needs to improve year over year by about 13 percentage points in order to get to the first quarter guidance, am I in the ball park there?

\*     \*     \*

**Jim Bloem**

*You are right directionally in terms of the PDP benefit ratio, what we had said, based on the low income fees there is going to be quite a difference in the front end of this year versus last year and it has to do with having fewer low income.*  The percentage of 13 basis points that you sighted is a little bit high, it's not quite that much but we didn't say what it was going to be. We are guiding to our overall Medicare benefit ratio but you are right on track in terms of the first quarter will show a dramatic improvement in the benefit ratio.

(Emphasis added).

120.     Further, Defendant Murray, the Company's Chief Operating Officer, also responded to a question regarding whether there were any positive or negative surprises on the PDP sales:

> **Matt Perry – Wachovia Capital Markets**
>
> From your comments it sounds like attrition is a little bit lower and the group sales are also a little bit lower.  Any kind of positive or negative surprises on the PDP up selling so far or where the agents sell?
>
> **Jim Murray**
>
> No, Mike talked about this in some of his remarks, ***it's pretty remarkable that we can look and see how much of a spend we have for a particular, for example how much we spend for a cable ad and how many calls that will drive and then we have statistics around how many of those calls will convert to a lead and how many of those leads that will convert to a sale and how many of those sales will result in a referral of friend or a family member.  It's remarkable and all of the different sales channels that we have, direct mail versus a cable TV***.
>
> ***That's pretty predictable*** and there are a lot of levers that we pull. ***Nothing has surprised us this year***; we talked last year when we were together that we were surprised with some of our competitors and some of their benefit offerings. ***Nothing really has been a big surprise for us this year.***

(Emphasis added).

121.     On February 12, 2008, Defendant Bloem participated in the UBS Global Healthcare Services Conference in New York, NY and reiterated that the Company expected EPS in the range of $5.35 to $5.55 for the full year 2008.

122.     On February 28, 2008, Defendant McCallister participated in the Merrill Lynch Investor Meetings in Toronto, Canada, and reiterated that the Company expected EPS in the range of $5.35 to $5.55 for the full year 2008.

123. The inaccurate statements above failed to disclose that: (i) the Company had significant material weaknesses in its internal controls such that the Company's financial reporting lacked a reasonable basis at all relevant times; (ii) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the prescription drug costs of its newly acquired members; (iii) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the correct pricing and discounts for members in its PDP plans; (iv) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the mix shift of high and low cost members in its PDP plans; and (v) due to the significant material weaknesses in the Company's internal controls, the assumptions underlying the Company's first quarter and full year earnings guidance provided by Defendants in February of 2008 were flawed and inaccurate.

124. During the Class Period, Defendants issued direct and indirect communications to the Plan's participants, including statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, press releases and the Plan documents (including SPDs and/or prospectuses regarding the Plan's holdings of Company Stock), which included and/or reiterated these statements. Upon information and belief, at all times during the Class Period, the Company's SEC filings (which included the statements made above) were incorporated into and part of the SPDs and/or the Form S-8 registration statements.

## XI.    ACCURATE INFORMAION IS FINALLY RELEASED TO THE PLAN PARTICPANTS

125. On March 12, 2008, Humana issued a press release entitled *Humana Revises Earnings Guidance*. The press release stated in relevant part:

LOUISVILLE, KY (March 12, 2008) – Humana Inc. (NYSE: HUM) today announced that the company has revised its guidance for diluted earnings per common share (EPS) for the first quarter of 2008 (1Q08) and for the year ending December 31, 2008 (FY08).  The revised guidance is the result of updated projections for the company's FY08 stand-alone PDP financial performance.  The company's Medicare Advantage, Commercial and Military services businesses are not affected by this revision in earnings guidance.

Humana now anticipates EPS for 1Q08 in the range of $0.44 to $0.46 versus its previous guidance of $0.80 to $0.85 with EPS for FY08 now projected to be in the range of $4.00 to $4.25 compared to previous guidance of $5.35 to $5.55.

The company's revised projections for its stand-alone PDPs' financial performance are based upon analysis of pharmacy claims through February 2008.  Higher-than-anticipated claims volumes for the stand-alone PDPs year to date are reflective of a combination of factors including:

- Enhanced Plan actuarial assumptions versus experience,
- Enhanced Plan new member experience, and
- Standard Plan member mix.

126.    Also on March 12, 2008, the Company held a conference call with analysts to explain why its prior EPS guidance was so far off-base.  Defendants McCallister and Bloem who participated in the call, outlined how they had trouble deciding on the co-payment amount to charge customers in preparing the PDPs for the year pursuant to the CMS requirement that customers have no more than 33% responsibility for costs of prescription drugs.  Defendants McCallister and Bloem explained that because they believed that consumers would be responsible for more than 33% of the costs of prescription drugs due to an increase in the usage of tier III drugs, certain Defendants caused or allowed the Company to lower its co-pay.  This assumption that there would be an increased usage in tier III drugs, however, was wrong and Defendants either knew or should have known that they could not accurately gauge the level of tier III drug usage or were reckless in basing such an important decision as the pricing of co-

payments for PDPs on such a drastically incorrect estimation.  As Defendant Murray stated, "we should have assumed that members would likely change their behavior and substitute lower tier drugs rather than lowering our co-pays."  As a result of lowering the Company's co-payments and customers moving to lower co-paying drugs anyway, customers were now only responsible for 26% of costs of the prescription drugs, instead of the targeted 33%.  According to Defendant Murray, the lower cost share resulted in "an approximately $160 million shift of drug costs to Humana."

127.    This, however, was not the only negative result of lowering the Company's co-pays.  Higher cost customers value shopped, and realized that Humana's PDP plan offered lowered co-pays.  These new members cost the Company significantly more money than the renewing members.  According to Defendant Murray, these new members' utilization of the Company's PDP negatively impacted Humana's earnings by $80 million.

128.    Further, Defendants reported that there would be a lower amount of low income customers compared to voluntary low cost customers than it experienced in the past due to low income customers leaving the Company's PDP.  Since low income customers cost the Company more than twice as much as low cost customers, the higher percentage loss of low income customers would be a positive event that saved the Company money.  However, both these groups left at an equal rate and the savings never materialized.  This meant that $120 million worth of reported expected reductions did not occur.  In particular, the Company stated during the earnings call:

**Jim Murray - Humana Inc. – COO**

Thank you, Mike.  Since our discussion this morning is operationally driven, I'll provide more color around what has transpired.  For the next several minutes, I will be walking you through the background of the PDP issues which led to what we

reported earlier today.  First, I will describe at a high level the CMS PDP bid development process so you can better understand how our PDP issues were created.

Next, I'll detail the issues we have isolated which drove our PDP results to differ from what we expected.  Briefly, these issues include the impact of enhanced plan actuarial assumptions differing from experience, enhanced plan new member experience, and the mix of our standard plan membership being different than we had anticipated.  Finally, I'll describe the corrective actions we have developed to ensure these specific issues are corrected in our January 2009 PDP bid development process, and equally important that similar issues will not recur in future periods.

Let's start with a quick review of the PDP bid development process.  Of all the elements involved in preparing PDP bids, the issue we are having a problem with relates to the CMS requirement that enhanced benefits meet actuarial equivalence tests, one of which requires that members have no more than a 33% responsibility for costs before the coverage gap.  Our handling of this requirement -- which I'll discuss in a moment -- is directly resulting in about one third of our issue and indirectly impacts the remainder.

When evaluating possible changes to our drug formulary, we overestimated the use of tier III drugs by members.  When we overestimated the tier III drug use, our calculated member cost share was higher than prescribed by CMS.  Therefore, in order to meet the CMS actuarial equivalence [leap] test of 33% member cost share, we lowered our co-pays.

*In hindsight, we should have assumed that members would likely change their behavior and substitute lower tier drugs rather than lowering our co pays.  As a result of lowering our co pays, our member cost share has become 26% rather than the targeted member cost share of 33% that I described a moment ago.  The lower member cost share results in an approximately $160 million shift of drug cost to Humana.*

*A consequence of our lower co-payments is a selection by higher cost members of our enhanced plait as they value shopped.  We enrolled 188,000 new enhanced plan members effective January 1, 2008.   Emerging costs for these new members are approximately $50.00 per member per month higher than those for renewing members.  After considering the likely impact of the*

*coverage gap, these new members' higher utilization approximates $80 million.*

Now moving to the standard plan.  As we've shared with you in the past, low income members have higher costs than voluntary members.  Our experience shows us that low income costs on a per member per month basis are approximately two and a half times that of voluntary members with a related trend for those low income members of around 16% per year.  Because we exceeded the benchmark in nine states, we anticipated the percentage of our low income/high cost membership to total membership would drop significantly as you see on the slide.

*Unfortunately, although we lost approximately 270,000 low income members, we also lost around 250,000 lower cost voluntary members, which resulted its a relationship of low income members to total members staying about the same year-over-year and is show on the right on the slide.  Having the same relationship of higher cost/low income members to total members rather than the expected relationship, creates an additional exposure of $120 million.*

\*     \*     \*

**Greg Nersessian – Credit Suisse – Analyst**

Hi, good morning.  Actually, my first question was you were estimating the volume of the Tier III drug use, how big was the differential between what you expected the Tier III drug use based on historical actual experience and what you're actually seeing?  Can you give us a bit of color on why there has been such a large change in that?

**Jim Murray – Humana Inc. – COO**

Sure.  The historical drug use or member cost share for us has been 33%.  It's now coming out to be around 26%.  *When we looked at and set our original estimations around what kind of Tier III utilization we might get and made the mistake that we made, we anticipated that Tier III utilization would go from 6% that we had historically been experiencing up to 15%.*  That's because of the actuarial equivalency requirement prescribed by CMS.  We inappropriately changed our co-pay levels, which drove the 33% going to 26%.

**Greg Nersessian - Credit Suisse – Analyst**

So you were assuming it would go from 6% to 15% and then what is it actually – ?  Is it closer.

**Mike McCallister – Humana Inc. – President and CEO**

It's right back to 6%.

\*     \*     \*

**Charles Boorady – Citigroup – Analyst**

Jim and Mike, you've both been doing most of the talking and have described this as an operational issue.  We haven't heard a lot from Jim Bloem and isn't there also a finance and controller component to this.  Is there a greater role or greater responsibility that they can take in trying to ensure shareholders as a company you're providing a budget and guidance to us that's more conservative and takes some of these risks into consideration?

**Jim Bloem – Humana Inc. – SVP and CFO**

Yes, Charles, you're right.  ***This is a professional embarrassment to all of us.***  But in looking at the cause of this, what we're saying to you today is that it basically has a singular cause around this actuarial assumption that everything else tumbles out of and again, as Mike and Jim have said we're going to – A, fix it for 2009 by benefit design and by premium design; and then we're also going to redouble our efforts internally and externally about how we look at these plans, so that we can continue to give you guidance as have over the last seven or eight years that we've met consistently going forward.

 (Emphasis added).

## XII.   <u>CAUSATION/LOSSES</u>

129.   The Plan suffered enormous losses because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in Humana stock during the Class Period in breach of Defendants' fiduciary duties.

130.   Defendants are liable for the Plan's losses in this case because:  (a) most of the Plan's investment in Humana stock was the result of Defendants' decisions to invest the Plan's Employer Matching Contributions in Humana stock and (b) as to the portion of Plan's assets

invested in Humana stock as a result of participant contributions, Defendants are liable for these losses because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

131.    Defendants also are liable for losses that resulted from their decision to invest a majority of the assets of the Plan in Humana stock rather than cash or other investment options, which was clearly imprudent under the circumstances presented here.

132.    Defendants withheld material, non-public facts from the Plan's participants and provided inaccurate and incomplete information to them regarding the true health and ongoing profitability of Humana and its soundness as an investment vehicle.   As a consequence, the Plan's participants did not exercise independent control over their investments in Humana stock, and Defendants remain liable under ERISA for losses caused by such investment.

133.    Had Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, and eliminating or reducing Humana stock as an investment alternative when it became imprudent, the Plan would have avoided some or all of the losses that it, and indirectly, its participants suffered by continuing to invest in Humana stock.

134.    Plaintiffs, on behalf of the Plan, seek alternative types of relief under ERISA.

135.    First, Plaintiffs, on behalf of Plan, seek damages as a result of Defendants' breaches.   In particular, Plaintiffs, on behalf of Plan, seek the profit they lost by investing in Humana stock instead of investing in other funds within the Plan that were available at the time and which have outperformed the returns on Humana stock.

136.    Second, Plaintiffs, on behalf of the Plan, seek to recover the losses they incurred by investing their retirement funds in Humana stock when the stock price was artificially inflated.

137.    Third, Plaintiffs, on behalf of the Plan, seek to recover the losses caused to the Plan and its participants when the price of Humana's stock declined significantly as the market began to learn the truth about Humana's improper practices as alleged in this Complaint.

138.    Fourth, Plaintiffs, on behalf of the Plan, seek a Constructive Trust – both individually and on behalf of the Plan – over all amounts by which the Plan fiduciaries benefited as a result of their breaches.  In particular, Plaintiffs seek to impose a Constructive Trust on the amounts received by certain Defendants for selling their Humana stock, including amounts that certain Defendants received when they sold Humana common stock at the same time that those Defendants were causing the Plan to use the Plan's assets to acquire and hold that stock.

139.    In addition, Plaintiffs seek equitable relief and such other relief as is appropriate under ERISA.

## XIII.   REMEDY FOR BREACHES OF FIDUCIARY DUTY

140.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Humana stock during the Class Period.   As a consequence of Defendants' breaches, the Plan suffered significant losses.

141.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

142.    With respect to calculating the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have maintained its investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investment available to them.  The Court should adopt the measure of loss most advantageous to the Plan.  In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

143.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of: a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; taxable costs and interest on these amounts, as provided by law; and such other legal or equitable relief as may be just and proper.

144.    Under ERISA, each defendant is jointly and severally liable for the losses suffered by the Plan in this case.

### XIV.   DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST

145.    As ERISA fiduciaries, Defendants are required to manage the Plan's investments, including the investment in Humana stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their

beneficiaries.  This duty of loyalty requires fiduciaries to avoid conflicts of interests and to resolve them promptly when they occur.

146.    Conflicts of interests abound when a company that invests plan assets in company stock flounders.  This is because as the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other.  As courts have made clear "'[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions.'"  *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir. 1992) (citation omitted). Here, Defendants breached this fundamental fiduciary duty.

147.    First, Defendants failed to investigate whether to take appropriate and necessary action to protect the Plan, and instead, chose the interests of the Company over the Plan by continuing to offer Humana stock as a plan investment option, and continuing to maintain Humana stock as an investment in the Plan.

148.    Second, certain of the Defendants, who knew or should have known of Humana's artificially inflated stock price during much of the Class Period, benefited directly from this knowledge or neglect by selling their personal holdings of Humana stock for significant gain. During the Class Period, ***Company insiders sold Humana stock for proceeds of over $26,519,000***.  The following is a summary of the insider sales:

| Insider Last Name | Position | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| James H. Bloem | Senior Vice President, Chief Financial Officer | 12/19/07 | 14,106 | $74.27 | $1,047,652.62 |
| | | 12/19/07 | 2,370 | $74.27 | $176,019.90 |
| **Total** | | | **16,476** | | **$1,223,672.52** |
| | | | | | |
| Arthur P. Hipwell | Senior Vice President and General Counsel | 12/20/07 | 5,613 | $75.65 | $424.623.45 |
| | | 12/26/07 | 600 | $76.30 | $45,780.00 |
| | | 12/26/07 | 400 | $76.31 | $30,524.00 |

| Insider Last Name | Position | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 12/26/07 | 800 | $76.32 | $61,056.00 |
| | | 12/26/07 | 200 | $76.33 | $15,266.00 |
| | | 12/26/07 | 1,100 | $76.35 | $83,985.00 |
| | | 12/26/07 | 300 | $76.37 | $22,911.00 |
| | | 12/26/07 | 3,600 | $76.38 | $274,968.00 |
| | | 12/26/07 | 200 | $76.39 | $15,278.00 |
| | | 12/26/07 | 2,100 | $76.40 | $160,440.00 |
| | | 12/26/07 | 4,100 | $76.41 | $313,281.00 |
| | | 12/26/07 | 1,200 | $76,42 | $91,704.00 |
| | | 12/26/07 | 4.800 | $76.43 | $366,864.00 |
| | | 12/26/07 | 500 | $76.44 | $38,220.00 |
| | | 12/26/07 | 16,900 | $7.,45 | $1,292,005.00 |
| | | 12/26/07 | 20,000 | $76.47 | $1,529,400.00 |
| | | 12/26/07 | 12,778 | $76.47 | $977,133.66 |
| | | 12/26/07 | 100 | $76.47 | $7,647,00 |
| | | 12/26/07 | 100 | $76.49 | $7,649.00 |
| **Total** | | | **75,391** | | **$5,758,735.11** |
| | | | | | |
| David A. Jones | Chairman of the Board | 11/15/07 | 690 | $72.40 | $49,956.00 |
| | | 12/24/07 | 6,610 | $76.91 | $508,375.10 |
| | | 01/02/08 | 12,090 | | $912,432.30 |
| **Total** | | | **19,390** | | **$1,470,763.40** |
| | | | | | |
| Michael B. McCallister | Chief Executive Officer, President and Director | 11/14/07 | 2,055 | $73.33 | $150,693.15 |
| | | 11/16/07 | 4,706 | $72.40 | $340,714.40 |
| | | 11/16/07 | 7,555 | $72.20 | $545471.00 |
| | | 12/17/07 | 20,400 | $73.50 | $1,499,400.00 |
| | | 12/17/07 | 300 | $73.50 | $22,050.00 |
| | | 12/17/07 | 100 | $73.50 | $7,350.00 |
| | | 12/17/07 | 100 | $73.50 | $7,350.00 |
| | | 12/17/07 | 5,850 | $73.51 | $430,033.50 |
| | | 12/17/07 | 100 | $73.51 | $7,351.00 |
| | | 12/17/07 | 2,950 | $73.52 | $216,884.00 |
| | | 12/17/07 | 1,900 | $73.53 | $139,707.00 |
| | | 12/17/07 | 100 | $73.53 | $7,353.00 |
| | | 12/17/07 | 4,400 | $73.54 | $323,576.00 |
| | | 12/17/07 | 100 | $73.54 | $7,354.00 |
| | | 12/17/07 | 100 | $73.54 | $7,354.00 |
| | | 12/17/07 | 10,800 | $73.55 | $794,34000 |
| | | 12/17/07 | 100 | $73.55 | $7,355.00 |
| | | 12/17/07 | 300 | $73.56 | $22,068.00 |
| | | 12/17/07 | 100 | $73.56 | $7,356.00 |

| Insider Last Name | Position | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 12/17/07 | 600 | $73.58 | $44,148.00 |
| | | 12/17/07 | 100 | $73.58 | $7,358.00 |
| | | 12/17/07 | 100 | $73.58 | $7,358.00 |
| | | 12/17/07 | 400 | $73.59 | $29,436.00 |
| | | 12/17/07 | 8,000 | $73.60 | $588,800.00 |
| | | 12/17/07 | 200 | $73.60 | $14,72000 |
| | | 12/17/07 | 1,100 | $73.61 | $80,971 00 |
| | | 12/17/07 | 500 | $73.62 | $36,810.00 |
| | | 12117/07 | 10,500 | $73.63 | $773,115.00 |
| | | 12/17/07 | 2,068 | $73.64 | $152,287.52 |
| | | 12/17/07 | 700 | $73.65 | $51,555.00 |
| | | 12/17/07 | 100 | $73.65 | $7365.00 |
| | | 12/17/07 | 200 | $73.66 | $14,732.00 |
| | | 12/17/07 | 200 | $73.67 | $14,734.00 |
| | | 12/17/07 | 100 | $73.67 | $7,367.00 |
| | | 12/17/07 | 100 | $73.67 | $7,367.00 |
| | | 12/17/07 | 900 | $72.68 | $66,312.00 |
| | | 12/17/07 | 300 | $73.69 | $22,107.00 |
| | | 12/17/07 | 1,132 | $73.70 | $83,428.40 |
| | | 12/17/07 | 100 | $73.70 | $7,370.00 |
| | | 12/17/07 | 1,100 | $73.71 | $81,081,00 |
| | | 12/17/07 | 100 | $73.71 | $7,371.00 |
| | | 12/17/07 | 2,900 | $73.72 | $213,788.00 |
| | | 12/17/07 | 100 | $73.73 | $7,373.00 |
| | | 12/17/07 | 600 | $73.74 | $44,244.00 |
| | | 12/17/07 | 100 | $73.74 | $7,374.00 |
| | | 12/17/07 | 100 | $73.74 | $7,374.00 |
| | | 12/17/07 | 2,200 | $73.75 | $162,250.00 |
| | | 12/17/07 | 100 | $73.75 | $7,375.00 |
| | | 12/17/07 | 800 | $73.76 | $59,008.00 |
| | | 12/17/07 | 200 | $73.79 | $14,758.00 |
| | | 12/17/07 | 400 | $73.82 | $29,52800 |
| | | 12/17/07 | 200 | $73.83 | $14,766,00 |
| | | 12/17/07 | 100 | $73.84 | $7,384.00 |
| | | 12/17/07 | 900 | $73.85 | $66,465.00 |
| | | 12/17/07 | 89,874 | $73.29 | $6,676,739.46 |
| | | 12/17/07 | 1,345 | $73.29 | $99,920.05 |
| | | 12/17/07 | 101 | $73.29 | $7,503.29 |
| | | 12/17/07 | 21,192 | $73.15 | $1,613,770.80 |
| | | 12/18/07 | 817 | $73.62 | $60,147.54 |
| | | 12/18/07 | 326 | $73.62 | $24,000.12 |
| | | 12/18/07 | 326 | $73.62 | $24,000.12 |
| **Total** | | | **213,297** | | **$15,797,321.35** |

| Insider Last Name | Position | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | | | | |
| James E. Murray | Chief Operating Officer | 12/21/07 | 200 | $75.12 | $15,024.00 |
| | | 12/21/07 | 134 | $75.13 | $10,067.42 |
| | | 12/21/07 | 800 | $75.14 | $60,112.00 |
| | | 12/21/07 | 200 | $75.14 | $15,028.00 |
| | | 12/21/07 | 366 | $75.15 | $27,504.90 |
| | | 12/21/07 | 300 | $75.15 | $22,545.00 |
| | | 12/21/07 | 800 | $75.16 | $60,128.00 |
| | | 12/21/07 | 500 | $75.17 | $37,585.00 |
| | | 12/21/07 | 100 | $75.18 | $7,518.00 |
| | | 12/21/07 | 100 | $75.19 | $7,519.00 |
| | | 12/21/07 | 100 | $75.19 | $7,520.00 |
| | | 12/21/07 | 400 | $75.22 | $30,088.00 |
| | | 12/21/07 | 100 | $75.24 | $7,524.00 |
| | | 12/21/07 | 500 | $75.25 | $37,625.00 |
| | | 12/21/07 | 300 | $75.28 | $22,584.00 |
| | | 12/21/07 | 700 | $75.31 | $52,717.00 |
| | | 12/21/07 | 200 | $75.34 | $15,068.00 |
| | | 12/21/07 | 800 | $75.36 | $60,288.00 |
| | | 12/21/07 | 600 | $75.37 | $45,222.00 |
| | | 12/21/07 | 800 | $75.38 | $60,304.00 |
| | | 12/21/07 | 1,400 | $75.39 | $105,546.00 |
| | | 12/21/07 | 200 | $75.40 | $15,080.00 |
| | | 12/21/07 | 200 | $75.41 | $15,082.00 |
| | | 12/21/07 | 200 | $75.42 | $15,084.00 |
| | | 12/21/07 | 200 | $75.42 | $15,084.00 |
| | | 12/21/07 | 300 | $75.43 | $22,629.00 |
| | | 12/21/07 | 200 | $75.44 | $15,088.00 |
| | | 12/21/07 | 600 | $75.45 | $45,270.00 |
| | | 12/21/07 | 100 | $75.46 | $7,546.00 |
| | | 12/21/07 | 100 | $75.47 | $7,547.00 |
| | | 12/21/07 | 800 | $75.49 | $60,392.00 |
| | | 12/21/07 | 100 | $75.51 | $7,551.00 |
| | | 12/21/07 | 200 | $75.52 | $15,104.00 |
| | | 12/21/07 | 400 | $75.56 | $30,224.00 |
| | | 12/21/07 | 1,300 | $75.57 | $98,242.00 |
| | | 12/21/07 | 200 | $75.58 | $15,116.00 |
| | | 12/21/07 | 700 | $75.59 | $52,913.00 |
| | | 12/21/07 | 400 | $75.62 | $30,248.00 |
| | | 12/21/07 | 600 | $75.63 | $45,378.00 |
| | | 12/21/07 | 400 | $75.64 | $30,256.00 |
| | | 12/21/07 | 600 | $75.67 | $45,402.00 |
| | | 12/21/07 | 1,290 | $75.69 | $97,640.10 |

| Insider Last Name | Position | Date | Shares | Price | Proceeds |
|---|---|---|---|---|---|
| | | 12/21/07 | 310 | $75.70 | $23,467.00 |
| | | 12/21/07 | 300 | $75.72 | $22,716.00 |
| | | 12/21/07 | 700 | $75.75 | $53,025.00 |
| | | 12/21/07 | 1,100 | $75.76 | $83,336.00 |
| | | 12/21/07 | 700 | $75.77 | $53,039.00 |
| | | 12/21/07 | 1,100 | $75.78 | $83,358.00 |
| | | 12/21/07 | 200 | $75.83 | $15,166.00 |
| | | 12/21/07 | 700 | $75.85 | $53,095.00 |
| | | 12/21/07 | 200 | $75.87 | $15,174.00 |
| | | 12/21/07 | 155 | $75.89 | $11,762.95 |
| | | 12/21/07 | 200 | $75.99 | $15,198.00 |
| | | 12/21/07 | 300 | $76.00 | $22,800.00 |
| | | 12/21/07 | 100 | $76.01 | $7,601.00 |
| | | 12/21/07 | 145 | $76.02 | $11,022.90 |
| | | 12/21/07 | 5,000 | $76.26 | $381,300.00 |
| | | 12/21/07 | 300 | $76.41 | $22,923.00 |
| **Total** | | | **30,000** | | **$2,269,367.27** |
| | | | | | |
| *COLLECTIVE TOTAL* | | | *354,554* | | *$26,519,868.65* |

## XV.   ERISA § 404(c) DEFENSE INAPPLICABLE

149.   ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions. In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

150.   ERISA § 404(c) does not apply here for, among others, the following three reasons:

(a)   First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering Humana stock as an investment option in the Plan, or to continue making matching contributions in

Humana stock, as these are not decisions that were made or controlled by the participants. *See* Final Reg. Regarding Participant Directed Individual Account Plan (ERISA Section 404(c) Plan) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA § 404(c) plan is a fiduciary function which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan");

(b)     Second, as to participant directed investment in Humana stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by failing to provide complete and accurate material information to participants regarding Humana stock. *See* 29 C.F.R. § 2550.404c-l(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in Humana stock as a result of their investment directions, and Defendants remain entirely responsible for losses that result from such investment; and

(c)     Third, upon information and belief, the Plan participants were not informed that the Plan intended to comply as a § 404(c) plan in the manner required by ERISA and applicable regulations. Therefore, § 404(c) of ERISA does not apply to participants' "investment decisions" regarding Humana stock,

and Defendants remain liable for losses suffered by participants during the Class

Period as a result of such decisions.

151.    Because ERISA § 404(c) does not apply here, Defendants' liability to the Plan,

the Plaintiffs and the Class (as defined) for losses caused by the Plan's investment in Humana

stock is established upon proof that such investments were or became imprudent and resulted in

losses in the value of the Plan's assets during the Class Period.

## XVI.  <u>CAUSES OF ACTION</u>

### COUNT I

**Failure to Prudently and Loyally Manage the Plan's Assets**
**<u>(Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)</u>**

152.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this

Complaint as if fully set forth herein.

153.    At all relevant times, as alleged above, all Defendants were fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary

authority or control over the administration and/or management of the Plan or disposition of the

Plan's assets.

154.    Under ERISA, fiduciaries who exercise discretionary authority or control over

management of a plan or disposition of a Plan's assets are responsible for ensuring that

investment options made available to participants under a plan are prudent.  Furthermore, such

fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

Defendants were responsible for ensuring that all Plan investments, including the investment in

Company stock, were prudent consistent with the purpose of the Plan.  Defendants are liable for

losses incurred as a result of such investments being imprudent.

155.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

156.    Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate information regarding the Plan's investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all of the Plan's investment options, including investment in Company stock.

157.    Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Class Period, Defendants knew or should have known that, as described herein, Humana stock was not a suitable and appropriate investment for the Plan because:  (i) the Company had significant material weaknesses in its internal controls such that the Company's financial reporting lacked a reasonable basis at all relevant times; (ii) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the prescription drug costs of its newly acquired members; (iii) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly

calculate the correct pricing and discounts for members in its PDP plans; (iv) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the mix shift of high and low cost members in its PDP plans; and (v) due to the significant material weaknesses in the Company's internal controls, the assumptions underlying the Company's first quarter and full year earnings guidance provided by Defendants in February of 2008 were flawed and inaccurate.

158.    Investment in Company stock during the Class Period clearly did not serve the Plan's stated purpose of helping participants save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings.   During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect the Plan from the inevitable losses that they knew or should have known would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

159.    During the Class Period, upon information and belief, Defendants fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.   As such, Plan participants could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

160.    Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in the other Defendants' failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock.

Defendants had knowledge of such breaches by the other Plan fiduciaries, yet made no effort to remedy the same.

161.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses, and indirectly the Plan participants, lost a significant portion of their retirement investment.

162.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

**Failure to Provide Complete and Accurate Information to Participants and Beneficiaries
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by All Defendants)**

163.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

164.    As alleged above, during the Class Period, all Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

165.    As alleged above, during the Class Period, the scope of Defendants' fiduciary responsibilities included disseminating Plan documents and/or Plan-related information to participants regarding the Plan and/or Plan's assets.

166.    Defendants, as Plan fiduciaries, are required under ERISA to speak truthfully to participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of

the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options, such that participants can make informed decisions with regard to the prudence of investing in such options available under the Plan.  This duty applies to all Plan investment options, including investment in Humana stock.

167.    This fiduciary duty to honestly and accurately communicate with participants is designed not merely to inform participants and beneficiaries of misconduct bearing on their retirement savings, but also to forestall such misconduct in the first instance.  By failing to discharge their disclosure duties, Defendants facilitated the misconduct in the first instance.

168.    Defendants were obliged to provide participants with complete and accurate information concerning all of the Plan's assets.  However, their duties of honest and accurate disclosure were especially significant with respect to Humana stock because:  (a) during the Class Period, a large portion of the Plan's assets was invested in it; (b) company stock is a particularly risky and volatile investment, even in the absence of company misconduct or mismanagement; and (c) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock investment.

169.    Defendants breached their ERISA duty to inform participants by failing to provide complete and accurate information regarding the Company and Humana stock, and, generally, by conveying inaccurate information regarding the soundness of Humana stock, and the prudence of investing retirement contributions in the stock.  Specifically, Defendants failed to inform participants about the failure of the Company's internal controls, and the risks that failure presented for the Company.  Defendants also failed to inform participants that the Company's

disclosures regarding its improper activities were false and misleading, and caused the value of Humana stock to be artificially inflated.

170.     As a consequence of Defendants' failure to satisfy their duty to provide complete and accurate information under ERISA, the Plan's participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Humana stock, or to appreciate that under the circumstances known or that should have been known to the Defendants, Humana stock was an inherently unsuitable and inappropriate investment option for their accounts.  Furthermore, because public investors, including the Plan participants, were deprived of crucial, material information regarding the risks of Humana stock as an investment option, all of the Plan's acquisitions of Company stock during the Class Period occurred at inflated prices.

171.     Where a breach of fiduciary duty consists of, or includes, inaccuracies or omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such inaccuracies oromissions to his or her detriment.  Here, the above-described statements, acts and omissions of the Defendants in this Count  were material to any reasonable person's decision about whether or not to invest or maintain any part of their retirement assets in Humana stock during the Class Period.  Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on the inaccurate statements, acts, and omissions of Defendants named in this Count.

172.     As a consequence of the Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  Had Defendants discharged their fiduciary duties to promptly disclose material information, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan's participants and beneficiaries lost a significant portion of their retirement savings.

173.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

### Breach of Duty to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)

174.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

175.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

176.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

177.    Defendants breached their duty to avoid conflicts of interests and to promptly resolve them by, *inter alia*: (a) failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and (b) by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

178.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized

or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses, and indirectly the Plan participants, lost a significant portion of their retirement investments.

179.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count

**COUNT IV**

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA § 404 by Director Defendants)**

180.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

181.    At all relevant times, as alleged above, the Director Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

182.     At all relevant times, as alleged above, the scope of the fiduciary responsibility of the Director Defendants, included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the members of the Compensation and Benefits Committee, the Investment Committee and the Plan Committee.

183.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, the Director Defendants, had the duty to:

    (a)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan participants;

(b)     Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)     Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)     Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)     Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(f)     Ensure that the monitored fiduciaries report regularly to the Director Defendants.  The Director Defendants must then review, understand, and approve the conduct of the hands-on fiduciaries.

184.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a Plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

185.    The Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely

appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation.   The Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) imprudently allowing the Plan to continue offering Humana stock as an investment alternative for the Plan, and (ii) continuing to invest the Plan's assets in Humana stock when it no longer was prudent to do so.  Despite this knowledge, the Director Defendants failed to take action to protect the Plan, and concomitantly the Plan participants, from the consequences of these fiduciaries' failures.

186.   In addition, the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Humana, including, without limitation, that (i) the Company had significant material weaknesses in its internal controls such that the Company's financial reporting lacked a reasonable basis at all relevant times; (ii) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the prescription drug costs of its newly acquired members; (iii) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the correct pricing and discounts for members in its PDP Plan; (iv) due to the significant material weaknesses in the Company's internal controls, the Company was unable to properly calculate the mix shift of high and low cost members in its PDP Plan; and (v) due to the significant material weaknesses in the Company's internal controls, the assumptions underlying the Company's first quarter and full year earnings guidance provided by Defendants in February of 2008 were flawed and inaccurate.

187.    By remaining silent and by failing to disclose such information to the other fiduciaries, the Director Defendants breached their monitoring duties under the Plan and ERISA.

188.    The Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

189.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered losses, and the Plan participants, lost a significant portion of their retirement investments.

190.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## XVII.  CLASS ACTION ALLEGATIONS

191.    *Class Definition*.  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(l), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between September 1, 2007 and the present, and whose accounts included investments in Humana stock.

192.    *Numerosity*.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, based on the Plan's Forms 5500 for the Plan year 2007, over 21,994 active participants in the Plan who participated in, or were beneficiaries of, the Plan during the Class Period.

193. **Commonality**.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

(b) whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c) whether Defendants violated ERISA; and

(d) whether the Plan has suffered losses and, if so, what is the proper measure of damages.

194. **Typicality**.  Plaintiffs' claims are typical of the claims of the members of the Class because:  (1) to the extent Plaintiffs seek relief on behalf of the Plan pursuant to ERISA § 502(a)(2), their claim on behalf of the Plan is not only typical to, but identical to a claim under this section brought by any Class member; and (2) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.

195. **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

196. **Rule 23(b)(1)(B) Requirements**. Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members of the

Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

197.   ***Other Rule 23(b) Requirements***. Class action status is also warranted under the other subsections of Rule 23(b) because:  (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XVIII. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray for:

A.   A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.   A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C.   An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants caused through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

D.   Imposition of a Constructive Trust on any amounts by which any

Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

   E.  An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Humana stock;

   F.  Actual damages in the amount of any losses the Plan suffered;

   G.  An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

   H.  An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

   I.  An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants.

Dated:  October 24, 2008

        **JOHNSON, TRUE & GUARNIERI, LLP**


        By: _____s/ J. Guthrie True_____
        J. Guthrie True, Esq.
        326 West Main Street
        Frankfort, KY  40601
        Telephone:  (502) 875-6000
        Facsimile:   (502) 875-6008
        Email:  gtrue@jtgattorneys.com

        *Liaison Counsel for Plaintiffs*

        **GAINEY & MCKENNA**
        Thomas J. McKenna, Esq.
        295 Madison Avenue, 4th Floor
        New York, New York 10017
        Telephone: (212) 983-1300
        Facsimile: (212) 983-0383
        Email:  tjmckenna@gaineyandmckenna.com
           tjmlaw2001@yahoo.com

        *Lead Counsel for Plaintiffs*

**HARWOOD FEFFER LLP**
Robert I. Harwood, Esq.
Samuel K. Rosen, Esq.
Jennifer K. Hirsh, Esq.
Tanya Korkhov, Esq.
488 Madison Avenue
New York, New York 10022
Telephone:  (212) 935-7400
Facsimile: (212) 753-3630
Email: rharwood@hfesq.com
Email: srosen@hfesq.com
Email: jhirsh@hfesq.com
Email: tkorkhov@hfesq.com

*Attorneys for Michael J. Rose*

**LINER YANKELEVITZ SUNSHINE &**
    **REGENSTREIF LLP**
Ronald S. Kravitz, Esq.
199 Fremont Street, 20th Floor
San Francisco, CA  94105-2255
Telephone: (415) 489-7700
Facsimile: (415) 489-7701
Email: rkravitz@linerlaw.com

*Attorneys for Connie Riggs*

### CERTIFICATE OF SERVICE

        I hereby certify that on October 24, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

        J. Bruce Miller, Esquire
        jbm@jbmlg.com

        Robert N. Eccles, Esquire

        Gary S. Tell, Esquire

        Elysia M. Solomon, Esquire

                                _____s/  J. Guthrie True_____
                                *Liaison Counsel for Plaintiffs*