UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:08CV-211-H

MARIA BENITEZ, et al                                                                                   PLAINTIFFS

V.

HUMANA, INC., et al                                                                                   DEFENDANTS

## MEMORANDUM OPINION

Plaintiffs Maria Benitez, Lucretia Hocker, Michael J. Rose, and Connie Riggs (collectively "Plaintiffs") are participants in the Humana Retirement Savings Plan and the Humana Puerto Rico 1165(e) Retirement Plan (collectively the "Plan). Plaintiffs allege that Humana, Inc. ("Humana"), various of its officers and several of its corporate committees (collectively, "Defendants")[1] breached their fiduciary duties as administrators and managers of the Plan in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et. seq.* Each of the individual Defendants is an officer and/or director of Humana.

Defendants have moved to dismiss on the grounds that the Complaint does not state a viable claim for relief under ERISA. After a careful review, including a conference to discuss the issues, the Court concludes that the complaint does not state allegations which can support the causes of action against Defendants. No amount of discovery will change this conclusion.

---

[1] The actual named Defendants, in addition to Humana, include Michael B. McCallister ("McCallister"), James H. Bloem ("Bloem"), James E. Murray ("Murray"), Bonnie C. Hathcock ("Hathcock"), Deborah M. Triplett ("Triplett"), David A. Jones, Jr. ("Jones"), Frank A. D'Amelio ("D'Amelio"), W. Roy Dunbar ("Dunbar"), Kurt J. Hilzinger ("Hilzinger"), William J. McDonald ("McDonald"), James J. O'Brien ("O'Brien"), Ann Reynolds ("Reynolds"), unnamed John Does, the Compensation Committee, the Investment Committee, and the Plan Committee.

## I.

The facts relevant to the case concern the methods Humana devised to price its insurance products and who might be responsible for any mistakes.

Humana's core business function is providing supplemental health care plans to beneficiaries of government benefit programs, including Medicare. Medicare coverage is broken into four categories, one of which concerns prescription drugs. Private insurance companies offer Prescription Drug Plans ("PDPs") to cover the costs of these drugs. Terms of the PDPs vary, but generally participants pay a monthly premium and have a yearly deductible. Once the deductible is met, participants pay part of the cost of the prescription, a co-payment, and the insurance company covers the rest of the cost of the drug until the participants reach the initial coverage limit. After that point, the participants pay 100 percent of the cost of drugs up to a second limit. This period of time is called the "coverage gap." Once participants reach the coverage gap limit, the insurance company provides catastrophic coverage, which requires a very small co-payment.

Starting in 2006, Humana began offering stand-alone PDPs. The Centers for Medicare & Medicaid Services ("CMS"), a federal government agency, regulates and limits the out-of-pocket costs PDPs may require individuals to pay. Using actuarial equivalence tests, CMS evaluates each insurance company's PDP to determine whether each one qualifies as an approved PDP provider. To so qualify, an insurance company must devise a PDP so that plan members are not responsible for more than 33% of the costs of drugs before the coverage gap. Companies that provide PDPs attempt to meet the 33% costs exactly when setting their premiums. Failure to qualify would mean that the PDP cannot be marketed.

**A.**

Insurance companies, such as Humana, set premiums a year in advance based on actuarial assumptions and other information.  When Humana set its 2008 fiscal year premiums, it did so based on actuarial data that projected an increase in the use of prescription drugs that carry high co-payments (known as "tier III" drugs).  Humana estimated that the use of these tier III drugs would increase from 6% to 15%.  Based on that projected increase, Humana concluded it must lower the costumer co-payments for these drugs so that personal costs for PDP members would not exceed the 33% limit.  Given Humana's projections, had it not lowered its co-payments, the Humana PDPs would not have received CMS approval.

The process of making projections and setting prices is a complex one.  Humana uses a variety of projections and actuarial data to determine the amount of co-payment for each drug tier.  Its Pharmacy Business Unit (the "PB Unit") negotiated prescription prices with pharmacy chains.  That PB Unit gathered the relevant actuarial data through their claims-processing software.   The PB Unit then sent its data to Argus Health Systems ("Argus"), which is an independent company that acted as the middle-man between Humana and the pharmacies filling prescriptions for PDP enrollees.  Argus used the Humana data to determine the appropriate price for each category of prescriptions.

Plaintiffs allege that the PB Unit software was outdated and failed to properly organize and track claims data.  Based on flawed information, Argus set inconsistent prescription prices.  That information then factored into the calculation of the PDP premiums.  There is undoubtedly some element of truth to Plaintiffs assertion that "[t]he failure to organize and coordinate information concerning prescription pricing, input by Humana's employees at the Pharmacy

Business Unit, caused by the outdated claims processing software, resulted in flawed information being transmitted to Argus, which in turn led to inconsistent prescription pricing. . ." Ultimately, pricing required judgments about future consumer conduct which, by their nature, cannot be predicted without absolute certainty.

In September 2007, Humana issued its guidance for the 2008 fiscal year. Humana projected an earnings per share between $5.30 and $5.50. The SEC filing attributed Humana's strong financial performance to "the company's Commercial operations and stand-alone Medicare Prescription Drug Plans," projecting that both would positively impact the next fiscal year. From September 2007 until March 2008, Humana made repeated public statements in its SEC filings, in press releases, and at meetings and conferences with investors and analysts that its earnings per share would be between $5.30 and $5.55 for FY 2008. It repeatedly attributed Humana's performance to the improvements in commercial operations and the PDPs.

In January 2008, Humana re-affirmed its 2008 earnings guidance, but admitted that PDPs' gross sales were "somewhat ahead of expectations." In February, Humana raised its earnings projections by $.05, reflecting a lower tax rate than previously anticipated. At that time, Humana admitted that "the composition of our 2008 PDP membership [...] has changed from last year." Humana expected the composition of the PDP membership to have an impact on quarterly patterns, but not the full year, and thus did not adjust its earnings projections at that time. In February, Humana's Chief Operating Officer, Murray, said that statistics tracking the PDPs meant things were "pretty predictable" and led Murray to say, "Nothing has surprised us this year."

On March 12, 2008, Humana announced that it had mis-estimated its earnings per share

and that the year's earnings were now projected to be between $4.00 and $4.25 per share.  The change was announced in a press release and in a conference call with analysts.  Humana explained that the incorrect tier III drug use projections contributed to the incorrect earnings projections.  McCallister and Bloem stated that they had difficulty deciding on the co-payment for PDPs, eventually deciding to lower the co-pay.  At that time, Murray also stated: "In hindsight, we should have assumed that members would likely change their behavior and substitute lower tier drugs rather than lowering our co-pays."

Following the announcement, Humana's stock immediately dropped about 14 percent.  The incorrect projections also resulted in a direct loss to the company of over $300 million represented by the shift of drug costs to Humana, new higher-cost members who joined the Humana plan to take advantage of the lowered co-pays, and the ratio of low income customers to low cost costumers.  Neither the earnings restatement nor the direct financial loss underlying the restatement appears to have threatened Humana's long term viability or profitability.

Plaintiffs allege that due to material weaknesses in its internal controls Humana's financial reporting lacked a reasonable basis at all relevant times.  Because of those weaknesses, Humana improperly calculated the prescription drug usage based upon the pricing and discounts for members in the PDPs.  No doubt some such internal weakness or some mistakes contributed to Humana's improper calculation of the mix shift of high and low cost members in the PDPs.  These problems caused the assumptions underlying Humana's earnings guidance to be flawed and inaccurate.  Plaintiffs assert that "Defendants either knew or should have known that they could not accurately gauge the level of tier III drug usage or were reckless in basing such an important decision as the pricing of co-payments for PDPs on such a drastically incorrect

estimation." Thus, Plaintiffs suggest that Defendants caused the earnings guidance to be incorrect, thereby artificially inflating the stock price.

**B.**

Humana provides its employees benefits, including an individual account employee pension benefit plan. The Plan offers employees nine investment fund options and provides matching contributions by Humana. One investment fund is the Humana Unitized Stock Fund ("HSF"). The HSF invests in Humana common stock. The fund itself contains Humana common stock, owned by the Plan and not the participants themselves, and a small portion (approximately 2%) cash or cash equivalents to meet the cash needs for the fund's daily transactions. The Summary Plan Description ("SPD") states that the Charles Schwab Trust Company manages HSF and "ensure[s] that approximately 98% of the fund is invested in Humana common stock." Plan participants select which funds to invest in for their individual accounts. All matching contributions, however, are invested in Humana common stock. Humana common stock represents about 30% of the Plan's total investments. The Plan also incorporates by reference all SEC documents that Humana has filed.

When Humana's stock declined, the Plan lost some of its value. Plaintiffs, as Plan participants, claim Defendants are responsible for that loss due to Defendants' positions at Humana and fiduciary responsibilities to the Plan. Defendants ARE individuals with various positions at Humana and entities involved in the Plan management and administration. The Company, Humana, is the named Plan administrator and Plan Sponsor. It acts through its officers, directors, and employees. The Directors are members of the Board (collectively "Director Defendants") and include: McCallister (President, CEO, Director), Jones (Chairman of

the Board), D'Amelio (Director), Dunbar (Director), Hilzinger (Director), McDonald (Director), O'Brien (Director), and Reynolds (Director). The Director Defendants have primary fiduciary oversight of the Plan including its management and administration, management and disposition of assets, and appointing, monitoring, and removing fiduciaries. The Director Defendants have access to non-public Company financial information, corporate documents, etc. They participate in the issuance of statements including press releases and SEC filings. The Humana Officers include Bloem and Murray (collectively "Officer Defendants"). The Officer Defendants are privy to confidential information concerning Humana, participate in day-to-day management of the Company, participate in preparing public statements, and communicate with Plan participants. They have authority with respect to management and administration of the Plan and its assets.

The Director Defendants appointed several committees to administer and manage the Plan. The Compensation Committee, including Hilzinger (Chairman), Dunbar, and McDonald (collectively "Compensation Committee Defendants"), administers the programs, reviews management development planning status and policies, and monitors compensation actions by management. The Investment Committee, including Dunbar (Chairman), D'Amelia, and O'Brien (collectively "Investment Committee Defendants"), assists the Board in establishing investment objectives and policies for employee benefit plans and reports to the full Board on Committee actions. The Plan Committee, including Hathcock (Senior VP, Chief HR Officer), Triplett (Director of Associate Benefit Programs and Policy), and John Does (committee members) (collectively "Plan Committee Defendants"), is responsible for making all policy decisions under the plan and reviews and rules on any claims that may have been appealed. It

also is responsible for day-to-day administration and management of the Plan.

## II.

Plaintiffs brought this action on behalf of the Plan and as individuals, as a class action. The complaint alleges four separate counts, all of which arise from the common circumstances detailed above. When Humana restated its earnings projections for FY 2008 on March 12, 2008, the price of Humana shares declined precipitously, causing the value of many Humana employee pension plans to decline as well. Though stated in four separate counts, the main thrusts of Plaintiffs' grievances are that the individual Defendants should have been suspicious about the earnings projection; should have investigated the accuracy of those projections; and in doing so would have discovered that the new pricing would lead to different conduct by both non-plan members and plan members than projected.

Count I alleges a breach of fiduciary duties of loyalty and prudence. Plaintiffs claim that Defendants knew or should have known that Humana stock was not an appropriate investment due to the inaccurate reporting of information which caused the incorrect earnings projections; that Defendants did not protect the Plan from losses arising from the non-disclosed problems; and that Defendants fostered a positive attitude toward Company stock by not disclosing negative material information. Plaintiffs also claim that Defendants prevented Plan participants from knowing the true risks of the Humana stock investment. Plaintiffs generally assert three grievances: (1) that Humana should not have continued matching contributions entirely in Humana common stock, (2) that the Plan participants' investments in the HSF should not have been left 98% in Humana common stock, and (3) that Plan participants should have been discouraged or told not to continue their investments in HSF.

Counts II and IV allege claims integral to those in Count I.  Count II asserts a breach of fiduciary duties for failing to provide complete and accurate information to Plan participants. Plaintiffs allege that Defendants conveyed inaccurate information about the soundness of Humana stock and the prudence of investing in it, and failed to inform the Plan participants about Humana's internal control problems.  Count IV asserts a breach of duty to adequately monitor other appointed fiduciaries who actually made the mistaken earning projections.

Count III is slightly different, alleging a breach of individual Defendants' duty to avoid conflicts of interest.  In support of that assertion, Plaintiffs cite Bloem, Jones, McCallister, and Murray's sales of their personal Humana stock in November, December, and January.  Plaintiffs also claim that Defendants placed the Company's interests over the Plan by failing to investigate the investment decisions; continuing to offer Humana stock as an investment option; and maintaining the Plan investment in Humana stock.

Plaintiffs seek their lost profits from investing in Humana stock instead of other funds available within the Plan at the same time.  They also seek to recover their losses incurred by investing their retirement funds in Humana stock when the stock price was artificially inflated as well as those losses incurred when Humana stock declined once the earnings projections were adjusted.  Finally, Plaintiffs seek a constructive trust over all amounts by which the Defendants benefitted as a result of their breaches.

## III.

A court should dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6) "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *H. J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989) (citation and quotation

omitted). While the Court must "view the complaint in the light most favorable to the plaintiff [and] treat all well-pleaded allegations therein as true," *Amini v. Oberlin College*, 259 F.3d 493, 497 (6th Cir. 2001), it is not required to accept as true "unwarranted legal conclusions and/or factual allegations." *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 327 (6th Cir. 2006). As the Supreme Court recently held, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted) (alteration in original); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1953 (2009) (applying *Twombly* to all civil matters).

The strongest argument against dismissal is that discovery will lead to evidence supporting the claims. The Court will bear this argument in mind as it analyzes each claim.

## IV.

Count I of the complaint alleges that Defendants breached their fiduciary duty of prudence and loyalty by (1) failing to liquidate or diversify the existing individual and matching fund investments in Humana stock; (2) failing to advise or discourage Plaintiffs from continuing to invest in Humana stock; and (3) continuing to invest matching funds in Humana stock.

### A.

ERISA "imposes far-reaching standards governing the operation of [employee pension and welfare benefit] plans, including a set of 'standards of conduct, responsibility, and obligation for fiduciaries' entrusted with management of the plans." *Corley v. Hecht Co.*, 530 F. Supp. 1155, 1160 (U.S.D.C. 1982) (citations omitted). Fiduciaries who exercise discretionary management and administrative authority must meet a "prudent man" standard of care. 29

U.S.C. § 1104. That standard itself has three components. *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995). "The first element is a 'duty of loyalty' pursuant to which 'all decisions regarding an ERISA plan 'must be made with an eye single to the interests of the participants and beneficiaries.'" *Id.* at 1458 (quoting *Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1162 (6th Cir.1988)) (internal citations omitted). Second, ERISA imposes a "prudent man" obligation, which is "'an unwavering duty' to act both 'as a prudent person would act in a similar situation' and 'with single-minded devotion' to those same plan participants and beneficiaries." *Id.* (quoting *Berlin*, 858 F.2d at 1162). Third, ERISA fiduciaries must avoid conflicts of interest, as they "must act for the exclusive purpose of providing benefits to plan beneficiaries." *Id.* (quoting *Berlin*, 858 F.2d at 1162) (internal quotations and citation omitted).

When applied to eligible individual account plans ("EIAPs") and employee stock ownership plans ("ESOPs"), however, these duties are modified. 29 U.S.C. § 1104(a)(2). These plans are exempt from any requirement to diversify plan investments and the prudence requirement, when the plan invests in qualifying employer securities. *Id.* Congress specifically exempted both plans to encourage investment in employer stock. *Kuper*, 66 F.3d at 1458 (quoting *Donovan v. Cunningham*, 716 F.3d 1455, 1466 (5th Cir. 1983)); *See also Edgar v. Avaya, Inc.*, 503 F.3d 340, 347 (3d Cir. 2007). Nevertheless, a plan may not "completely prohibit diversification of [EIAP] assets," because doing so would "override ERISA"s goal of ensuring the proper management and soundness of employee benefit plans." *Id.* at 1457.

Accordingly, a strict standard of review does not apply to EIAP fiduciary investment decisions. *Id.* at 1459; *See also Moench v. Robertson*, 62 F.3d 553, 570 (3d Cir. 1995) (stating that strict scrutiny review would render the diversification exception essentially meaningless).

-11-

Instead, EIAP fiduciary decisions are reviewed for abuse of discretion. *Kuper*, 66 F.3d at 1459.[2]

Under that standard, the Court "presume[s] that a fiduciary's decision to remain invested in

employer securities was reasonable." *Id.* Reasonableness is presumed whether the claim is

failure to diversify or failure to liquidate. *Id.* at 1457, 1459. A fiduciary still has a duty to

investigate whether an investment decision is appropriate. *Id.* at 1459. But a failure to

investigate is only actionable if "an adequate investigation would have revealed to a reasonable

fiduciary that the investment at issue was improvident." *Id.* at 1460.

The "*Kuper*" presumption of prudence thus "requires fiduciaries to divest their plans of

company stock only when holding it becomes so risky-that is, so imprudent-that the problem

could not be fixed by diversifying into other assets." *In re Ford Motor Co. ERISA Lit.*, 590 F.

Supp. 2d 883, 892-93 (E.D. Mich. 2008). The Sixth Circuit has held that the fiduciaries'

decision to hold company stock while aware of events that would continue to cause the stock to

decline in value was reasonable. *See Kuper*, 66 F.3d at 1460 (stating that the plaintiffs'

allegations were insufficient to rebut the presumption). The stock price in *Kuper* declined from

more than $50 per share to approximately $10 per share. *Id.*

As an example, in *DiFelice v. U.S. Airways, Inc.*, U.S. Airways employees brought a

class action challenging the fiduciaries' investments in company stock. 497 F.3d 410, 414 (4th

Cir. 2007). The fiduciaries included high-ranking company officers. During the class period,

_____

[2] Although the plan in *Kuper* was an ESOP, the Sixth Circuit based its holding on the statutory provision that excepts both ESOPs and EIAPs from the diversification requirement. *Kuper*, 66 F.3d at 1459. The statutory provision makes no distinction between the two plans. 29 U.S.C. § 1104(a)(2). The Court finds no reason to distinguish between ESOPs and EIAPs for purposes of determining whether a fiduciary's actions were impermissible. Furthermore, the Sixth Circuit developed its standard of review from the Third Circuit standard outlined in *Moench*, 62 F.3d 553. *Kuper*, 66 F.3d at 1458-59. In a subsequent opinion, the Third Circuit explicitly stated that the abuse of discretion standard applied to both ESOPs and EIAPS. *Edgar v. Avaya, Inc.*, 503 F.3d 340, 347-48 (3d Cir. 2007).

U.S. Airways faced serious financial hurdles, calling its viability into doubt.  U.S. Airways even

began considering filing for bankruptcy, but believed that it could successfully restructure

voluntarily.  The Fourth Circuit concluded that even a showing that the company offered

company stock during a time of grave uncertainty for the company was insufficient to overcome

the presumption.  *Id.* at 425.  Other circuits have reached similar conclusions.  The Ninth Circuit

stated that "[m]ere stock fluctuations, even those that trend downward significantly, are

insufficient to establish the requisite imprudence" to rebut the *Kuper* presumption.  *Wright v. Or.*

*Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004) (holding that fiduciaries are not

required to diversify EIAPs "upon each subsequent rise in share value attributed to a merger or .

. . any other major corporate development").  The Fifth Circuit concluded that where "[t]here is

no indication that [the company's] viability as a going concern was ever threatened, nor that [the

company's] stock was in danger of becoming essentially worthless," the plaintiffs had not

overcome the presumption.  *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 255 (5th Cir.

2008).

 This standard of "presumed reasonableness" and its application in the above

circumstances seem to set an appropriately high barrier for moving forward in cases of this kind.

B.

 Plaintiffs first claim that Defendants breached their fiduciary duties by miscalculating the

PDPs and projected earnings for FY 2008 and that Defendants failed to investigate those

mistakes.  However, Plaintiffs do not allege that Defendants themselves actually made the

mistakes.  They blame the mistakes on "internal control problems" and "old software."  If

Defendants did not make the mistakes, the mere fact that the mistakes were made cannot, by

-13-

itself, be sufficient to allege a breach of Defendants' fiduciary duties.  Plaintiffs must show that a reasonable fiduciary would have investigated and discovered the mistakes.

Plaintiffs provide no facts suggesting that Defendants actually knew of the problems leading to the errors in the PDPs pricing or the errors in the projected earnings.  No where in the Complaint does Plaintiff articulate how any Defendant knew of the problems or why any Defendant would have known about the software problems.  Plaintiffs only identify each Defendant's position with the Company[3] and assert that Defendants knew or should have known about the internal control problems and the old software.  Although the Court accepts all factual allegations in the Complaint as true at this stage, it is not called to accept a conclusory and speculative inferences.  There must be more than a formulaic recital of the elements of a claim. The fact of the mistakes alone, in these circumstances, is not enough to suggest Defendant's knowledge of them or their duty to have discovered them.

Still, Plaintiffs contend that the necessary inference could arise from the known facts. Plaintiffs make much of the discrepancy between the actual 6% utilization and the projected 15% utilization of tier III drugs used to set the PDP premiums.  Plaintiffs contend that such a discrepancy is questionable on its face and was sufficient to put Defendants on alert that an investigation was needed. This argument is undercut by the fact that the discrepancy involved a mere projection of human behavior rather than a known and quantifiable set of data.  In other words, the employees making the estimates were not dealing with known behaviors, but rather projections of it.  Thus, it's likely that a reasonable fiduciary would not have known there was a

---

[3] These positions, over the years, include director, senior vice president, chief financial officer (full-time and interim), treasurer, chief operating officer, market and segment operations, service operations, health plan division, chief human resources officer, and director of associate benefit programs and policy.

problem based solely on the discrepancy.

Moreover, the Court notes that Humana had only been offering stand-alone PDPs for two years when it set its 2008 premiums. During that time, CMS was also phasing in new assessment criteria.[4] This also indicates that changes in projections may have been expected. Of course, Defendants did not calculate the projections themselves, but rather relied upon independent persons (independent from the fiduciaries) to do so which indicates that Defendants would likely have been able to reasonably rely on the information produced by these professionals and would not have been alerted to a need to investigate. In fact, Plaintiffs allege no facts showing that a similarly situated fiduciary would have investigated based on the discrepancy in the utilization projections.

Even if Plaintiffs did allege sufficient grounds to suggest Defendants should have further investigated the EPS guidance or the underlying utilization projections, Plaintiffs must also allege that an investigation would yield different results; i.e. an investigation would have shown the fiduciaries their error. Therefore, the Complaint must contain either facts supporting that the projections were obvious miscalculations or that the data used was clearly inaccurate. While in hindsight the projections may have been inaccurate, there is nothing to show that they were miscalculated in their original form. Plaintiffs do allege that the computer software used to make the projection was old and, thus, caused the variations in pricing. However, there is nothing in the complaint to indicate that Defendants should have known that the old software would produce such mistaken results. There is simply no indication that Defendants would have found

---

[4]Although Defendants are sophisticated and educated players in the health care benefits market, two years of specifically relevant information provides scant basis for questioning the projections. Adding to the confusion, between 2005 and 2007 CMS transitioned its reimbursement model to use new factors.

the problems even if they had looked.[5]

Without facts to support the conclusory allegations that a fiduciary would have discovered the problems with the PDP premiums and the projected earnings, Plaintiffs cannot maintain their claim for breach of fiduciary duty.  No doubt, in hindsight, the calculations were erroneous.  The Plaintiffs may even be able to prove that some employees made mistakes.  However, that does not mean that Defendants, who relied on third parties, should have recognized these mistakes.  The Complaint fails to sufficiently allege any facts suggesting that Defendants knew or should have known of the software problems or any other internal control problems that would give rise to errors in the calculations.

## C.

As noted, the law has properly provided fiduciaries with significant leeway when holding their own company stock.  That means that even if Defendants had a duty to investigate, and even if they had discovered the alleged errors in the calculations earlier, to continue holding Humana stock is presumed to be prudent.  Because Plaintiffs damages are based on Defendants failure to divest the Plan's holdings in Humana stock and the notion that it was imprudent to continue to invest in Humana stock, Plaintiffs must allege sufficient facts that overcomes the high presumption of prudence in maintaining and investing in Humana stock.  The Court's review concludes, as a matter of law, that the continued investment in Humana shares was not improvident.

The Court looks to the complaint for allegations that could rebut the presumption.  The

---

[5]The Court also notes that a multitude of factors invariably goes in to making projections for PDP premiums.  The projections are an effort to predict human behavior in the future.  Therefore, it is even less likely that if an investigation had been conducted, the fiduciaries, who reasonably rely on the work of others in calculating the premiums, would have discovered that there was an error in the calculations.

decline in Humana's stock price is an insufficient rebuttal. Here, the mistaken original earnings guidance would not have led a reasonable fiduciary to conclude that the investment itself was so risky as to be improvident because it did not disguise an underlying weakness in the business or its future viability. The Court takes judicial notice that events subsequent to March, 2008, have shown that an investment in Humana stock is not so risky that it would be an abuse of discretion for the fiduciaries to continue it.

Additionally, had Defendants divested the Plans of Humana stock at any time prior to the March 12 announcement, they would have faced potential liability under securities laws for insider trading. *See Edgar v. Avaya, Inc.*, 503 F.3d 340, 350 (3d Cir. 2007) (stating same). Fiduciaries cannot be required to subject themselves to securities liabilities in order to avoid breaches of fiducial duties. This is one of the underlying policy reasons for the presumption itself.

Finally, once the mistake was made, which as discussed above was not a breach of Defendants' fiduciary duties, continuing to invest in the stock could not have caused the claimed injury. Given the efficient market hypothesis, the stock market price would have decreased whenever the information about Humana's errors in its earnings guidance was released. Waiting until March 12 did not exacerbate or prevent any losses as the market accurately reflected the true effect of the information that the earnings guidance was wrong. Therefore, as *Kuper* supports, this Court should presume that Defendants acted prudently.

For the foregoing reasons, the Court finds that the allegations contained in Count I of the Complaint are insufficient to state a claim upon which relief can be granted and must be dismissed.

**V.**

Count II alleges a breach of the fiduciary duty ERISA imposes to convey complete and accurate information to plan participants. *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 452 (6th Cir. 2002). This is actually a negative duty not to misinform and an affirmative duty to provide information when silence might be harmful. *Id.* ERISA specifically delineates the disclosure duties. 29 U.S.C. §§ 1021-26. Fiduciaries, need only to disclose the specific information the statute delineates. *Sprague v. GMC*, 133 F.3d 388, 405 (6th Cir. 1998) (stating that "ERISA's fiduciary standards [cannot] be used to imply a duty to disclose information that ERISA's detailed disclosure provisions do not require to be disclosed."). Material information must be communicated but not misrepresented. *James*, 305 F.3d at 452. Even negligent material misrepresentations to plan participants can breach ERISA fiduciary duties. *Pfahler v. Nat'l Latex Products Co.*, 517 F.3d 816, 830 (6th Cir. 2007). "A misrepresentation is material 'if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision.'" *Pfahler*, 517 F.3d at 831 (citing *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002)).

Courts have not generally attach ERISA fiduciary duties to confidential business details like internal controls or pricing decisions. *See, e.g., Banks v. Healthways, Inc.,* 2009 WL 211137, at *3 (M.D. Tenn. 2009) (stating that there is no affirmative duty to disclose non-public information regarding the company's financial condition); *In re Goodyear Tire & Rubber Co. ERISA Litig.*, 438 F. Supp. 2d 783, 794 (N.D. Ohio 2006) (concluding that business decisions do not constitute fiduciary actions); *In re Ferro Corp. ERISA Lit.*, 422 F. Supp. 2d 850, 864 (N.D. Ohio 2006) (holding that defendants did not have a duty to disclose non-public information

about alleged accounting irregularities).  *But cf.  Brieger v. Tellabs, Inc.*, 2009 WL 1565203, *15 (N.D. Ill. 2009) (stating that a fiduciary can avoid tension between ERISA fiduciary duties and security responsibilities by simultaneously disclosing business information to plan participants and the general public).  In *Edgar v. Avaya*, the plaintiffs alleged, as Plaintiffs do here, that the employer had made public statements and forecasts that misled plan participants about the company's future earnings prospects. 2006 WL 1084087, *2 (D.N.J. 2006).  The New Jersey District Court dismissed the claim, concluding that the plaintiffs offered "nothing more than a hindsight view of the Company's prior statements to support conclusory allegations that these prior statements were inaccurate and misleading at the time they were made." *Id.* at *26-27.  The Court concludes that this reasonable approach applies here.

As a consequence, for instance, the Third Circuit has concluded that plan fiduciaries did not breach their duty of disclosure by informing plan participants of several adverse corporate developments in the company earnings announcements and not earlier.  *Edgar v. Avaya, Inc.*, 503 F.3d 340, 350-51 (3d Cir. 2007).[6]  Moreover, the duty not to make material misrepresentations does not impose a "duty of clairvoyance." *Swinney v. Gen. Motors Corp.*, 46 F.3d 512, 520 (6th Cir. 1995) (quoting *Berlin v. Mich. Bell Tel. Co.*, 858 F.2d 1154, 1163-64 (6th Cir. 1988)).  Thus, the Plans were not entitled to know about the earnings restatements

---

[6] It follows that the preparation of SEC filings is not a fiduciary act for purposes of ERISA, even if the SEC filings are incorporated by reference into ERISA documents.  *See Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 257 (5th Cir. 2008) (stating that statements made by fiduciaries in securities filings are not generally made in a fiduciary capacity); *Shirk v. Fifth Third Bancorp*, 2009 WL 692124, *16 (S.D. Ohio 2009); *Crowley v. Corning, Inc.*, 234 F. Supp. 2d 222, 228 (W.D.N.Y. 2002); *Mellot v. ChoicePoint, Inc.*, 561 F. Supp. 2d 1305, 1317 (N.D. Ga. 2007); *But cf. Varity Corp. v. Howe*, 516 U.S. 489, 504 (1996) (stating that SEC statements are actionable under ERISA only to the extent that they are specifically tied to plan benefits); *In re Ferro Corp ERISA Litig.*, 422 F. Supp. 2d at 865 (stating that incorporating allegedly false SEC filings into plan documents does create a cause of action). This means simply that including incorrect statements in an SEC filing does not create a cause of action here.

before everyone else in the market.

Thus, the responsibility here is two-fold: one, the fiduciaries must ensure that any statements they do make are truthful and two, the fiduciaries must make complete statements. Of course, to make a claim of omission, Plaintiffs must identify the additional information that was required to be disclosed. *In re Huntington Bancshares Inc. ERISA Litig.*, 2009 WL 330308, *11 (S.D. Ohio 2009) (citing *Twombly*, 127 S. Ct. at 1965-66).

The law does not require that fiduciaries share every piece of information they know with the beneficiary, particularly where that information is not known to be relevant or material. Plaintiffs claim that Defendants omitted information about the old and malfunctioning data processing software. Such information cannot properly be considered material. The day to day mechanics of the business, although they may impact material information, are themselves to a large extent mundane. Although the fiduciary relationship imposes important duties, the requirement of disclosure of mechanical and managerial details goes too far. Material information includes the earnings projections, prospective gains, and prospective losses, not each piece of raw data or formula underlying those conclusions. Knowing how the claims processing software worked would not have a substantial likelihood of helping a reasonable employee make an informed investment decision. The connection between the processing software and the financial health of the company is a complicated chain of connections. Defendants do not have a duty to disclose every link in that chain. Since the state of the data processing software is not material, Defendants had no duty to disclose it.

Defendants could only have failed in their duty to disclose accurate material information by disclosing flawed earnings guidance published in Humana's SEC filings, and then repeatedly

publicizing it.  Since Defendants did eventually disclose the error, the claim must be that the information should have been disclosed earlier.  The Court must look, therefore, at the moment the disclosure was originally made to assess whether Defendants breached that duty.  The allegation is initially suspect because it is not clear that the company made SEC filings and other publications that could be considered fiduciary statements.  Even assuming that the statements are fiduciary statements does not end the analysis.

The Court has thoroughly examined what Plaintiffs allege Defendants knew or should have known at the time of the disclosure in Section IV of this opinion.  Having found Plaintiffs provided no basis to support that Defendants did or should have known of the errors, the Court finds no information that Defendants needed to disclose as fiduciaries.

## VI.

Count IV is entirely encompassed by Counts I and II.  It alleges a breach of Defendants' duty to monitor other fiduciaries and those appointed to manage and administer the plan.  *See* 29 U.S.C. § 1105(a) (providing that one fiduciary may be liable for another fiduciary's breaches).  Fiduciaries cannot breach that duty to monitor if the monitored fiduciaries did not breach a duty.  *Pedraza v. Coca-Cola Co.*, 456 F. Supp. 2d 1262, 1278 (N.D. Ga. 2006) (stating that there must be a primary breach to create a cause of action).

It is appropriate to dismiss a failure to monitor claim when Plaintiffs fail to adequately allege any breaches of fiduciary duty.  *Ward v. Avaya Inc.*, 299 Fed. Appx. 196, 202 (3d Cir. 2008); *Edgar*, 503 F.3d at 349 n.15; *Brieger v. Tellabs, Inc.*, 2009 WL 1565203, *18 (N.D. Ill. 2009); *In re Huntington Bancshares Inc. ERISA Litig.*, 2009 WL 330308, *11 (S.D. Ohio 2009).  Plaintiffs failed to sufficiently allege any underlying breach of fiduciary duty.  Thus, no primary

breach by a monitored fiduciary exists.  Without a primary breach, the supervisory fiduciaries cannot be liable for a failure to monitor.

## VII.

Count III of the complaint alleges Defendants failed to resolve two conflicts: (1) Plaintiffs allege that Defendants protected their own personal interests and the Company's interests because they artificially maintained a high price for Humana stock by not selling the Plan's stock when it was imprudent to hold it; and (2) Plaintiffs allege that Defendants sold their own stock as Company insiders (profiting by $26M).

Being both a plan fiduciary and a corporate officer causes the fiduciary to wear two hats. *Pegram v. Herdrich*, 530 U.S. 211, 225 (2000).  Those hats, however, must only be worn one at a time.  *Id.*  A corporate officer who is a plan fiduciary, therefore, often confronts potential conflicts of interest resulting from their duty of loyalty.  High company officials who sell personally-owned company stock while using the company fund to purchase more shares or who use the Plan for the purpose of propping up the stock price in the market suggest a breach of the duty of loyalty.  *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 422 (4th Cir. 2007).

Having already concluded it was prudent for the Plan to continue to hold Humana stock, the Court cannot find a conflict of interest for continuing to invest in the same stock.  For the Plan to invest in Humana stock did not artificially protect the Defendants' personal interests or the Company's interests by somehow maintaining a high price for the stock.  Defendants had no duty to sell the Plan's stock, and in fact may have breached their duty to follow the terms of the

plan had they divested.[7]  Nothing Defendants did could be construed to have subverted the

Plan's interests.

Defendants were following the Plan's explicit terms, as stated in the SPD, by investing

Plan assets in Humana stock.  Even though Directors sold some of their own stock, there is no

allegation of suspicious activity apart from Plaintiffs' allegations that those sales occurred during

the time that the stock price was allegedly inflated.  To make such an accusation necessitates the

fiduciaries played an active and intentional role in inflating the stock price; but the stock price

was not artificially inflated.  The allegations do not suggest anything more than poor judgment

on the part of the fiduciaries who relied on well-reasoned and researched advice in determining

the earnings projections.  To the extent that Plaintiffs' allegations contend that the Directors

were trading on insider information, such a claim should sound in securities law.

Having found the allegations insufficient to support an action for breach of fiduciary

duty, the Court need not address whether this action was properly raised under § 502(a)(3) and §

502(a)(2).  The Court will dismiss all claims regardless of how they were alleged.

The Court will issue an order consistent with this Memorandum Opinion.

cc:    Counsel of Record

---

[7] The Court recognizes that Plaintiffs allege in the Complaint that the Plan terms allow the fiduciary to divest any investment in Humana Stock.  (Compl. ¶ 34).  That plan document contradicts the SPD, and the Court has been informed that the plan language Plaintiffs cite was adopted after the time at issue.